(No. 15904.—Decree affirmed.)

THE TRUSTEES OF THE RUSH MEDICAL COLLEGE, Appellee, *vs.* THE UNIVERSITY OF CHICAGO *et al.*—(EDWARD J. BRUNDAGE, Attorney General, Appellant.)

*Opinion filed April 14, 1924.*

CHARITIES—*when medical college may transfer its property to similar charitable institution.* Although a medical college, by the unrestricted gifts of many donors, has functioned successfully for many years but having no endowment it is likely to cease its functions because it is not able to equip itself with modern facilities, equity may authorize the transfer of its property to an endowed university, to continue the giving of medical education; and where the transfer is approved by the court it is no objection that it is according to a plan or agreement submitted to the court by the parties concerned.

APPEAL from the Circuit Court of Cook county; the Hon. IRA RYNER, Judge, presiding.

EDWARD J. BRUNDAGE, Attorney General, and GEORGE E. DIERSSEN, for appellant.

SCOTT, BANCROFT, MARTIN & MACLEISH, (FRANK H. SCOTT, and HORACE H. MARTIN, of counsel,) for appellee.

TENNEY, HARDING, SHERMAN & ROGERS, and PHILLIPS, MACK & O'BRYAN, (HORACE KENT TENNEY, BERNARD FLEXNER, and ROBERT T. MACK, of counsel,) for the University of Chicago.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

In 1837 an act was passed incorporating Rush Medical College under the name of "Trustees of the Rush Medical College," the object of the corporation being "to promote the general interests of medical education and to qualify young men to engage usefully and honorably in the professions of medicine and surgery." Shortly thereafter it established a school of medicine and surgery in Chicago and up to this time has continuously conducted such a school. In 1871 substantially all its property was destroyed in the great Chicago fire. Since then it has, from donations made to it by its professors and other people and out of fees collected by it from students, purchased real estate situate at the corner of South Wood and West Harrison streets, in the city of Chicago, and has erected buildings thereon. One of the buildings was erected in 1875 and was then equipped as a medical and surgical school. In 1893 a laboratory building was erected across the street from the original building. About ten years later, through the generosity of Dr. Nicholas Senn and other friends of the school, Nicholas Senn Hall was built as an addition to the old college building. For twenty-five years the first two years of medical instruction has been given at the University of Chicago, and the last two years of such instruction, which consists largely of clinical work, has been furnished by Rush Medical College. In 1918 a third year was added, so that the college had the responsibility of the last three years' training of medical students. The college has never had an endowment fund, and has been able to attain the high rank among medical colleges which it holds, because of the generosity of physicians and surgeons interested in research work and medical education. A hundred or more clinical teachers have donated all their teaching service, and many of them have contributed from their private funds to keep

their departments up to standard.  If it had not been for the loyalty of this faculty the college would have discontinued its work years ago.

The University of Chicago was incorporated in 1890, its principal objects being "to provide, impart and furnish opportunities for all departments of higher education to persons of both sexes on equal terms;  *  *  *  to establish and maintain a university, in which may be taught all branches of higher learning, and which may comprise and embrace separate departments for literature, law, medicine, *  *  *  and all other branches of professional or technical education which may properly be included within the purposes and objects of a university, and to provide and maintain courses of instruction in each and all of said departments."  Persons interested in medical education, and especially in the establishment of a first-class college of medicine and surgery as a department of the University of Chicago, have created an endowment fund of $5,300,000, to be used and applied by the university to the work of medical and surgical education.  This fund has been raised by the efforts of the faculty of Rush Medical College and persons interested in the University of Chicago.

After extended and careful consideration of the subject of medical and surgical education and the existing condition of the same, and of the best course to pursue in order to advance, improve and enlarge the facilities for such education and make the same more efficient, the university and the college have prepared an agreement by which the college agrees to convey all the real and personal property which it owns (except certain minor trust funds that will not be affected by the agreement) to the university, and the university agrees to develop a medical and surgical school, and hospital in connection therewith, and to make all necessary and proper provisions for the operation and maintenance of said school and hospital on the university grounds, on the south side of Chicago.  The university further agrees

to establish and maintain a school for medical and surgical research work on the site of Rush Medical College, on the west side of Chicago, and to construct and equip at that place a new laboratory building costing not less than $400,000, to be occupied and used for the purposes of such school. It is further agreed that the university may designate its medical department as the "Rush Medical School of the University of Chicago," and it agrees to use the name "Rush" in connection with the name of the post-graduate school which is to be erected and maintained on the present site of Rush Medical College.

The Trustees of the Rush Medical College filed its bill in the circuit court of Cook county, setting out all the facts hereinbefore stated in much greater detail than we have considered it necessary to recite them for the purposes of this opinion, and alleging that "the net income of complainant at the present time is wholly insufficient to enable it to make such changes in and additions to its present medical school and laboratory, and the equipment thereof, as are necessary to meet the advances in medical and surgical science, and to keep said medical school and laboratory, and the equipment thereof, up to modern methods and afford the public the most efficient service, and that said net income is, in fact, wholly insufficient to enable complainant to make adequate and proper provision out of the same to cover depreciation in its present property." It suggests to the court that after mature consideration its faculty and governing officers have concluded that its objects and purposes can be best served by its becoming a part of the University of Chicago, and it presents to the court the agreement hereinbefore mentioned and asks the court's advice respecting the administration of the property intrusted to it. It requests the court to direct it to transfer its property to the university in accordance with the agreement, or to grant to it such other and different relief as the nature of the case may require and as the court may deem advisable. It prays that the

University of Chicago and the Attorney General may be made parties defendant and that they be required to answer. The university answered, admitting all the allegations of the bill, and submitted to the court for its decision the question of law arising upon the facts shown by the allegations of the bill and such other facts as might be shown by evidence to be taken.  The Attorney General answered, admitting most of the facts alleged but demanding strict proof of the allegation that the net income of the college is insufficient to enable it to continue to function as a college, and denying that the college has a legal right to transfer its property to the university in accordance with the agreement submitted to the court.  The cause was referred to a master, who took and reported the evidence.  The chancellor entered a decree in accordance with the prayer of the bill, and the Attorney General appeals.

The Attorney General admits that the findings of fact in the decree are supported by the evidence, but contends that the Trustees of the Rush Medical College, being a charitable corporation created by law for a definite purpose, cannot donate or transfer its funds to another corporation organized for similar purposes.

When Dr. Senn donated to the college $50,000, to be used in connection with other funds donated by members of the faculty and others, to erect an addition to the college building, he specified that the college should become the medical department of the University of Chicago as soon as it might be deemed advisable.  As we have said, all other property which the college proposes to transfer to the university is property acquired with funds paid to it for services or donated to it free from any trust, express or implied, created by any of the donors, and without any requirement or specification by any of said donors as to the purpose for which the same shall be used.  All the property is held, therefore, for the general purpose of promoting medical education.  If this worthy object is to be per-

312—8

formed, it is apparent from this record that some arrangement must be made whereby additional funds and additional facilities can be provided. Unless there is some legal obstacle to prevent the scheme sanctioned by the chancellor, it seems sound to conclude that the cause of medical education will be better served by transferring the college to the university as a going concern than to wait until there is a total collapse and then transfer the wreck to the university or some similar institution.

In *Sherman* v. *Richmond Hose Co.* 230 N. Y. 462, 130 N. E. 613, testatrix gave $10,000 to the company, with the provision that the income from it should be devoted to the proper uses of the company, which was organized for the purpose of aiding in the suppression of fires in the village of Batavia. Thereafter the village was organized as a city, and the city established a paid fire department. A controversy having arisen with respect to the disposition of this fund, it was held that the fund was impressed with a public trust, and that the city of Batavia should hold it in trust and devote the income therefrom to such uses as would promote fire protection.

In *Starr* v. *Morningside College,* (Iowa,) 173 N. W. 231, the testator bequeathed $2000 to Charles City College, to be added to and made a part of its endowment fund. Thereafter the college decided that it was unable to continue longer as a separate institution, and it entered into a merger agreement with Morningside College, which is located in another city. The court held that the gift was one in the interests of education in general, and that the fact that it was to be added to the endowment fund of another college of the same denomination at a different point did not render the gift void.

In *Lupton* v. *Leander Clark College,* (Iowa,) 187 N. W. 496, Leander Clark donated $50,000 to the college for the purpose of laying the foundation of an endowment fund, one of the conditions of his gift being that the college

should bear his name.  After his death the trustees of the college concluded that it was unable to maintain and support itself as an independent institution, and entered into negotiations with Coe College for the merger of the two and the transfer to Coe College of the $150,000 endowment fund of Leander Clark College.  It was held that the dominant motive and purpose of Clark was to make his gift for educational purposes, and that the transfer contemplated by the merger was not such a breach of obligation by the donee as would cause the fund to revert to the Clark estate.

In *Osgood* v. *Rogers,* 186 Mass. 238, 71 N. E. 306, there was a gift by the testator to two specified churches of the same denomination, with the direction to divide the income equally between them for their support and maintenance.  One of the churches ceased to exist, and the court held that the entire fund should be used for the benefit of the other.

In *People* v. *College of California,* 38 Cal. 166, the college had received from various persons donations for its benefit.  Finding itself unable, for want of sufficient resources, to establish an institution of learning, it entered into an agreement with a State college by which it donated to the State a 160-acre tract of land on condition that a State university should be established thereon.  This transfer being questioned after the university was established, the entire transaction was submitted to a court.  In approving the transaction the court said, among other things: "Under these circumstances it would be an extraordinary *casus omissus* in the law if the managers of a literary institution without a sufficient endowment to render it effective, were compelled, against their convictions and judgments, to maintain it in its feeble, sickly condition, when by a surrender of its franchise and devoting its property in aid of a new institution of learning a great public good might be accomplished.  We entertain no doubt whatever of the power of the president and trustees of the college

not only to surrender their franchise, but to transfer the corporate property, after the payment of debts, to the State for the use of the university. The end proposed to be accomplished by the president and trustees was not only lawful and within the scope of their powers but was eminently meritorious and conducive to the public interest. The fact that a portion of the funds of the college were the result of voluntary donations to it can in no degree impair the power of the trustees to surrender its franchise and dispose of its property in the manner proposed. * * * The donations were voluntary offerings by patriotic citizens in aid of the cause of education, and the management and disposition of the fund was confided absolutely to the president and trustees, subject only to such restrictions and limitations as the law imposed upon them."

In *Central University of Kentucky* v. *Walters' Exrs.* 122 Ky. 65, 90 S. W. 1066, in holding that the consolidation of a college and a university did not release the Walters estate from liability on a promise to contribute to the endowment of the Henry Bell Walters Professorship of Mathematics, the court said: "As there is nothing in the note or in the contemporaneous transaction binding the payee to apply the money otherwise than in the maintenance of a chair of mathematics in its university being conducted for Christian education, there was no limitation upon the power of the payee to change the location of its school or schools, or to change the manner of their government, or the adoption of particular means of effectuating the general purpose for which the institution was founded."

In *Mason* v. *Bloomington Library Ass'n,* 237 Ill. 442, there was a bequest in trust to establish, in connection with a named library corporation, an art studio for the advancement of education in art. The corporation named conveyed all its property to another library association. In holding that the fund should be administered by the second corporation, the court held that the bequest was not for the bene-

fit of the corporation named but was a charitable bequest for the purpose of establishing and maintaining an art studio, which was to be carried on for the advancement of education in art for the benefit of the public, and that it was proper for a court of chancery to carry out the original object through the new library association.

Rush Medical College has for three-quarters of a century been one of the leading institutions in the country engaged in teaching medicine and surgery.   After this long and honorable career it finds itself, because of changed conditions, unable to continue its usefulness.   Its buildings and equipment are out of date and its facilities for instruction according to modern standards are inadequate.   It has no funds with which to correct this situation, and unless the plan presented, or some plan similar to it, is adopted, its career must soon end.   The transfer of the property of the college to a similar charity under conditions which assure continuation of the use of the property in accordance with the purposes of the charter of the college, so that the fulfillment of the charitable purpose will be accomplished and the efficiency of this educational institution increased, is not a diversion of the funds to a purpose foreign to that to which they were dedicated.   If the college had presented its problem to a court of chancery without suggesting a remedy the court would have referred the case to a master, with directions to suggest a plan to carry out the object for which the college was organized.   The fact that a plan is suggested by persons whose loyalty to the cause establishes their good faith cannot change the situation.   The plan approved by the chancellor seems feasible, and the objection to the plan urged by the Attorney General does not find support in the authorities.

The decree of the circuit court is affirmed.

*Decree affirmed.*