57 So.2d 452 (1952)
FENSKE
v.
CODDINGTON et al.
Supreme Court of Florida, Division B.
March 11, 1952.
*453 Edward J. Gurney, Jr., Winter Park, for appellant.
W.E. Winderweedle, Winter Park, for Clarence A. Coddington, et al., as Successor Trustees, etc.
J.R. Wells, Orlando, for Board of Public Instruction, Orange County.
Campbell Thornal, Orlando, for Davella Mills Foundation and Richard W. Ervin, as Atty. Gen., of Fla., appellees.
MATHEWS, Justice.
The status of Robert Hungerford Industrial School was established by this court in 1937 in the case of Jordan v. Landis, 128 Fla. 604, 175 So. 241, 244. In that case this court said:
"Said property has, since the creation of the trust, always been publicly and notoriously used and actually occupied and well known as a negro industrial school, and exists for no other purpose.
"So it is that the said negro school is, and always has been, considered and dealt with as a public trust and charity and not an enterprise for profit. This is so, because it has never been self sustaining, but has been supported by gifts, donations, beneficiaries, and endowments made by charitable people interested in negro vocational education in Florida. And during the many years that have passed since the trust was created, the school has become possessed of considerable endowment funds, and its assumption of a recognized and important place in the function of educating negroes has gained for it a valuable measure of good will, entitling it to be considered as a part of an educational system for the vocational education of negroes as a public undertaking in this state."
The present suit was instituted by the successor trustees of the public charitable trust and property and assets of Robert Hungerford School located in Orange County, Florida. The object of the suit was to secure authority for the trustees to transfer to the Board of Public Instruction of Orange County, Florida all of the tangible personal property of the School and the real estate described in the bill of complaint subject to such terms and conditions as the court should fix in its decree and for other relief.
Subsequent to the suit of Jordan v. Landis, supra, the School had been operated by trustees appointed by the Chancellor and under his supervision and control.
The only heir who opposed the relief sought by the trustees was a granddaughter of the original settler of the trust.
After the cause was at issue the Chancellor took voluminous testimony and came to the conclusion as set forth in an interlocutory order that it was impractical and inexpedient to operate further the private boarding school on the premises in question for Negroes, and further that the carrying out of the basic object and the purpose and dominant thought and idea of the trust would be best served and most nearly accomplished by conveying outright to the public school system of Orange County, Florida, the real and tangible personal property of the school, reserving a chapel and the furnishings thereof together with *454 the right of ingress thereto and egress therefrom for further consideration.
Later, on May 9th a final decree was entered re-affirming the findings of the interlocutory decree, fixing the amount to be paid by the School Board in connection with the transfer of the real and personal property and directing the transfer of the subject property to the School Board. The final decree contained the following:
"That upon the conveyance of said real and personal property to The Board of Public Instruction of Orange County, Florida, said real property shall be used as a site for the operation of a public school thereon for negroes with emphasis on the vocational education of negroes and to be known as `Robert Hungerford Industrial School' and the personal property so conveyed to said Board shall be used in connection therewith. * * *
"There is reserved and excepted from the real estate conveyed by this deed the following described real estate situate, lying and being in Orange County, Florida, to-wit: (Description of Chapel) and there is likewise reserved the furnishings in the Stewart Memorial Chapel on the real property reserved; and there is also reserved to the grantors herein and their successors in trust the right of ingress and egress to and from the Stewart Memorial Chapel on said premises situate in Orange County, Florida, to-wit: (Description of right of way); said right of ingress and egress to include all persons who shall use said Stewart Memorial Chapel with the consent of the grantors herein or their successors in trust. * * *
"That this Court hereby reserves and shall retain jurisdiction in this cause over all of the funds, property and assets of the Public Charitable Trust of Robert Hungerford Industrial School of Eatonville, Orange County, Florida, not herein ordered transferred to said Board of Public Instruction."
The primary question involved in this appeal is: "Under the cy pres Doctrine, may a public body be utilized by a Court of Chancery in working out and accomplishing the basic object and purpose and dominant thought and idea of a charitable trust?"
There can be no doubt that this question was correctly answered in the affirmative by the Court below.
For 17 years it has been judicially determined that this property since its creation has been publically and notoriously used and actually occupied and well-known as a Negro industrial school and exists for no other purpose. It has always been considered and dealt with as a public trust and charity and not an enterprise for profit. It has never been self-sustaining but has been supported by gifts, donations, beneficiaries and endowments made by charitable people interested in Negro vocational education in Florida. It is entitled to be considered as a part of an educational system for the vocational education of Negroes as a public undertaking in this state. See Jordan v. Landis, supra.
In the voluminous testimony before the Chancellor he found that it was impractical and inexpedient to operate further a private boarding school on the premises and that the carrying out of the basic object and purpose and the dominant thought and idea of the trust would be best served and most nearly accomplished by conveying outright to the public school system of Orange County the real and tangible property mentioned in his order.
The facts brought out in the testimony before the Chancellor showed that when the trust was created in 1899 there was a real need for a private boarding school for Negroes. Since that time conditions have radically changed in Florida and throughout the South. At the present time sufficient funds to properly maintain and operate such a school are not available, and further there are insufficient pupils desiring a high-class boarding school such as was originally contemplated. These conditions have been brought about because of better educational facilities for Negroes in the public school system of Florida and elsewhere in the South.
D.E. Williams, State Director of Negro Education for the State Department of Education, and who has held that position for 24 years, testified that in 1900 there were 630 centers for Negroes in Florida which included 41,797 pupils and employed *455 645 teachers; in 1946-47 there were 808 centers enrolling 108,281 students and employing 3,490 teachers; and in 1950 there were 633 centers enrolling 123,068 pupils and employing 4,055 teachers. The year 1946-47 was the last year before the Minimum Foundation Program was established by the Legislature. This law authorized counties to consolidate smaller centers into larger permanent centers and provided state financial assistance for capital outlay, and to begin the reduction of the number of small centers and the establishment of better and larger permanent ones.
The plan and purpose of the Minimum Foundation Program is to provide minimum educational opportunities for all children regardless of their racial identity or where they live.
It might be well to note that for the school year 1928-29 the State appropriated less than one-half million dollars for the System of Free Public Schools and in 1949 the State appropriated approximately fifty million dollars for its System of Free Public Schools. What everybody knows this Court knows. We take judicial notice of the appropriation acts passed by the Legislature. Great, if not phenomenal, progress has been made by the State of Florida in carrying out the constitutional mandate for liberal support of the Free Public School System. It would be ideal if the Legislature could push a button and by so doing provide overnight for an adequate Free Public School System. The funds for this system are limited to appropriate action by the Legislature in levying a sufficient tax, the ability of the people to pay such tax and appropriating sufficient money to accomplish the desired purpose. The rapid progress which has been made by the State of Florida by providing educational facilities in our Free Public School System for Negroes is one of the reasons why the Chancellor found that it was not practical or expedient to further attempt to carry on this worthy institution, and that the purpose could be better accomplished as provided for in his final decree.
The purpose and intent of the Constitution of the State of Florida with reference to its public school system is well expressed in certain sections of Article XII of the Constitution, F.S.A. Section 1 of Article XII is as follows: "The Legislature shall provide for a uniform system of public free schools and shall provide for the liberal maintenance of the same."
Section 9 of Article XII is as follows: "In addition to the tax provided for in Section 8 of this Article the County School Fund shall consist of the proportion of the interest of the State School Fund and of the one mill State tax apportioned to the county, all capitation taxes collected within the county and all appropriations by the Legislature which shall with all other County School Funds be apportioned and distributed as may be provided by law and shall be disbursed by the County Board of Public Instruction solely for the support and maintenance of public free schools. Provided, that such apportionment and distribution shall be made by general law based upon some declared principle of classification to be determined by the Legislature. (As amended, general election, 1926.)"
Section 12 of Article XII is as follows: "White and colored children shall not be taught in the same school, but impartial provision shall be made for both."
It will, therefore, be observed that the purpose and intent of the Constitution of the State of Florida with reference to uniform system of free public schools is for all practical purposes the same as that of the trust in question as declared by this Court in the case of Jordan v. Landis, supra.
The Chancellor further had before him the reasons for discontinuing the programs of secondary education for negroes at the Florida Normal and Industrial Memorial College in St. Augustine and at Bethune-Cookman College in Daytona Beach. The Florida Normal and Industrial Memorial College in St. Augustine "was discontinued because public high schools were established, thereby making it unnecessary for this institution to promote such a program." The secondary department of the Bethune-Cookman College "was discontinued in 1936 because the Methodist *456 Board of Education withdrew support of the program on the secondary level, and because of the establishment of public high schools made the services rendered by the College on the secondary level unnecessary."
There was much further testimony to the same effect before the Chancellor which is unnecessary to detail here.
As to this primary question the Chancellor was correct that a public body such as the Board of Public Instruction of Orange County, a part of the educational system of this State, may properly be utilized by a Court of Chancery in working out and accomplishing the basic object and purpose and dominant thought and idea of the charitable trust involved in this cause. See Trustees of Pittsfield Academy v. Attorney General, 95 N.H. 51, 57 A.2d 161; Trustees of Madison Academy v. Board of Education of Richmond, Ky., 26 S.W. 187; Harwood v. Dick, 286 Ky. 423, 150 S.W.2d 704; Trustees of Rush Medical College v. University of Chicago, 312 Ill. 109, 143 N.E. 434; Fay v. Hunster, 86 U.S.App.D.C. 224, 181 F.2d 289.
The appellant proposes a secondary question as follows: "Where there is a Chapel for religious worship which is located in a portion of one of the buildings of a public school, does this constitute a violation of the First Amendment of the Constitution of the United States which provides for the separation of Church and State? Does it also constitute a violation of Section 6 of the Declaration of Rights of the Constitution of the State of Florida which provides that no public moneys be spent in aid of any sectarian institution?"
There is nothing in the decree which violates the First Amendment of the Constitution of the United States with reference to separation of Church and State, or Section 6 of the Declaration of Rights of the Constitution of the State of Florida, which provides that no public moneys be spent in aid of any sectarian institution. There is no prohibition in either the state or the federal Constitution against adults, youth, or children, worshipping God at any time or any place they may see fit. This worship may take place along the side of a road, in a field, on a stream, in a modest chapel, or in a great cathedral. The very fact that sufficient money from the original trust is retained by the trustees under the supervision of the Chancellor to maintain this chapel until the further orders of the Chancellor, and that no public (state) monies are to be spent in aid of any sectarian institution is sufficient evidence that neither the federal or the state Constitutions are being violated. Should the time ever come when these provisions of the state or federal Constitutions are being violated or there is an actual threat that they are about to be violated, the Courts are open for the application of proper remedies.
Another secondary question was presented as follows: "Where the Chancellor found that it was impracticable and inexpedient to operate further a private boarding school on premises belonging to a charitable trust, and there is ample evidence to support such finding, should the finding be affirmed?"
The Chancellor heard all of the evidence in this case, and he was familiar with the operations of this institution for many years. There was more than sufficient and ample evidence to support his findings and decree, and it should not and will not be disturbed on appeal. See Christian Herald Ass'n, Inc., v. First National Bank of Tampa, Fla., 40 So.2d 563; 10 Am.Jur. 676; First National Bank v. Elliott, 406 Ill. 44, 92 N.E.2d 66; Restatement of the Law of Trusts, § 399, p. 1213; Restatement of the Law of Trusts, § 399, p. 1218-1219.
Affirmed.
SEBRING, C.J., and CHAPMAN, J., and PARKS, Associate Justice, concur.