The First National Bank of Chicago, not Individually, but as Trustee Under the Last Will and Testament of E. Stanley Holland, Deceased, Plaintiff-Appellee, v. King Edward's Hospital Fund for London et al., Defendants-Appellees. Ethel Gwendoline Holland et al., Defendants-Appellants.

**Gen. No. 46,056.**

340

Opinion filed January 11, 1954. Released for publication March 8, 1954.

WINSTON, STRAWN, BLACK & TOWNER, and LATHAM CASTLE, all of Chicago, for appellants; HAROLD A. SMITH, ARTHUR D. WELTON, JR., and CALVIN SAWYIER, all of Chicago, of counsel.

RIORDAN, LINKLATER & BUTLER, of Chicago, for certain defendant-appellee; THOMAS P. RIORDAN, RICHARD

J. RIORDAN, and JOHN P. GORMAN, all of Chicago, and GORMAN & NESTOR, of New York City, of counsel.

DALLSTREAM, SCHIFF, STERN & HARDIN, of Chicago, for certain plaintiff-appellee; OSCAR D. STERN, GEORGE B. PLETSCH, and ALBERT E. HALLETT, all of Chicago, of counsel.

McKNIGHT, McLAUGHLIN & DUNN, of Chicago, for certain other defendants-appellees; T. I. McKNIGHT, EDWARD J. McLAUGHLIN, and HARRY L. KINSER, all of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.
E. Stanley Holland was born in 1867 near Leominster, in Herefordshire, England. He came to the United States when he was 26 years old, became a citizen and maintained his residence in Chicago up to the time of his death. He engaged successfully in the contract construction business. He made and published his last will and testament at Chicago on April 4, 1936. He died on June 2, 1936, and left a substantial fortune. He was a member of a large family and left him surviving several brothers and sisters and nieces and nephews. He had never married. His sister, Ethel Gwendoline Holland, lived with him and had charge of and cared for his home for 23 years. Ethel was naturally the object of the first dispositive provisions of the will. The next 9 articles (7 through 15) contain gifts ranging from 500 pounds to 1,000 pounds each for his brothers and sisters and nephews and nieces. There are two small remembrances to friends (Articles 16 and 17). After these provisions are four specific charitable gifts to English charities, one of which was an immediate gift to the Cottage Hospital at Leominster, which is also a benefiiciary under the residuary trust. Article

342

23 establishes a fund of 2,000 pounds to be known as the "E. Stanley Holland Easter Charity," a "Fund for the relief of 40 poor persons residing in the Borough of Leominster aforesaid." It sets forth detailed directions as to a board of trustees to administer the fund and for the trustees' conduct in distributing the income equally among 40 poor persons in the opinion of the trustees deserving and in need. The will then makes gifts of $1,000 each to 5 American charities and devises the residue of the estate under Article 30 to the First National Bank of Chicago as trustee.

The trust period is to be measured by the lives of 3 brothers and 4 sisters named as income beneficiaries under this article. During the trust period the income is to be distributed in stated proportions to those brothers and sisters and, in addition, to 6 nieces and nephews and 2 grandnieces. The share of income of any of these beneficiaries who may die is to be distributed to the charitable beneficiaries who are ultimately to receive the principal of Share B, hereinafter mentioned, in the same proportions as they are to receive that principal. On the death of the last brother and sister whose lives measure the trust period, the principal of the trust (after payment of one small contingent legacy) is to be divided into 2 equal parts designated Share A and Share B. Share A is thereupon distributable to the lawful descendants of a brother, 2 sisters and a nephew in various proportions, and with various gifts over, not here important, Share B at the same time is to be distributed among the following, to be held and used by them, subject to the following provisions: "One half (½) thereof to King Edward's Hospital Fund of London, England; One fourth (¼) thereof to Hereford General Hospital at Hereford, England; One eighth (⅛) thereof to Leominster Cottage Hospital, at Leominster, Herefordshire, England;

One Eighth (⅛) thereof to Hereford Eye and Ear Hospital, at Hereford, England. Said King Edward's Hospital Fund of London, England, said Hereford General Hospital, said Leominster Cottage Hospital, and said Hereford Eye and Ear Hospital shall each use its respective share of said Share B as an Endowment Fund and the income only thereof shall be used for the current expenditures of said respective beneficiary."

The First National Bank of Chicago, as trustee, entered upon the performance of the trust when the estate was closed in March 1938. The individual beneficiaries who were to receive certain percentage proportions of life income under the trust were, at the date of the testator's death, residents of England. One of these died in August 1936, another in November 1944, and a third in November 1946. In consequence, the trustee remitted to the 4 charitable institutions, including the 3 hospitals, shares of net income in accordance with the terms of the will. In 1946 Parliament passed the National Health Service Act, effective July 5, 1948. The Act's announced purpose was to promote the establishment in England and Wales of a comprehensive health service designed to secure improvement in the physical and mental health of the people of England and Wales and the prevention, diagnosis and treatment of illness, and for that purpose, to provide or secure the effective provision of services in accordance with the Act. The National Health Service Act did not affect the property or management of King Edward's Hospital Fund for London, hereinafter called the Fund, and none of its funds or properties, endowment or otherwise, was taken over under the Act. This corporation, following the passage of the Act, retained all its original charter powers and purposes and continued to act as a charitable corporation. Pursuant to Section 6

344

of the Act, the physical premises of the hospitals were transferred to the Minister of Health.

In November 1949, the trustee filed its complaint in chancery, seeking instructions whether certain charitable interests established under Article 30 of the will for the 3 hospitals and the Fund failed by reason of the nationalization of those hospitals and of medical care in general under the National Health Service Act. Following a hearing before the chancellor, he entered a decree sustaining the claims of representatives of the British Government to succeed to the gifts originally intended for the 3 hospitals which were taken over by the Government, and finding that the gift to the Fund had not failed. The decree conditioned the payment of the gifts to the British Government upon the making of an undertaking by the appropriate agencies of that Government to apply the money exclusively for the benefit of the particular hospitals named in the will in the manner directed by the will. The 3 hospitals were made defendants but entered no appearance and were defaulted. The Minister of Health, the Attorney General of England, the Birmingham Regional Hospital Board (hereinafter called the "Regional Board") and the Herefordshire Hospital Management Committee (hereinafter called the "Management Committee") were also made defendants. They entered their appearances and are represented by counsel. The Regional Board and the Management Committee are administrative bodies of the British Government, appointed under the Act to administer the hospital properties once belonging severally to, and operated independently by, the 3 hospital institutions designated in the will. The Fund, a charitable corporation formed by Act of Parliament in 1907 (after a ten-year existence as an unincorporated association) is the fourth beneficiary named in the will. It was made a party defendant, has entered

345

its appearance and is represented by counsel. The individual defendants, who appeal, are now the living heirs-at-law of the testator, including the widow and daughter of a deceased nephew who was an heir-at-law. The heirs ask that the decree be reversed and that we find that the property which is the subject of the charitable trusts made by Article 30 of the will, be paid to them as the testator's heirs-at-law. The Attorney General of Illinois now disclaims any interest in the case.

The individual defendants' theory of the case is that since the gifts under the will were to specific institutions, for a particular purpose and cannot literally be carried out, they failed and revert to the testator's heirs, because: (a) as to the gifts to the 3 voluntary hospitals, those institutions have ceased to exist and for that and other reasons it is impossible to carry out the particular intention the donor had in mind; (b) as to the gift to the Fund, the nationalization of the voluntary hospitals under the National Health Service Act of 1946 creates a situation in which it is impossible to carry out the particular intention the donor had in mind, although the Fund, as such, continues its corporate existence. Further, that since these were specific gifts it is improper to apply any theory of *cy pres* or "broad construction"; that the doctrine of judicial *cy pres* will be applied only where it is possible to carry out the testator's assumed general purpose, and where it is possible for the court applying the doctrine to have certainty that the trusts established will be fully executed; that the assumption by the British Government of all costs of all medical service for all persons renders it completely impossible to carry out the testator's intention; and that any plan which the court might work out could not be enforced by the court, but would be subject to the future whim of the British Par-

346

liament, which has already destroyed one gift in trust made under the will.

■■■■■ The ultimate issue in the case is whether as a consequence of the nationalization of the hospitals and the socialization of medicine, the gifts fail and the property reverts to the testator's heirs-at-law, the appellants herein. The law looks with favor upon charitable trusts and the courts apply liberal rules of construction to sustain them. They are liberal in adjudging a purpose charitable if there is any reasonable amount of social benefit accruing from the trust. In construing such gifts, if there are two possible methods of construction, one of which will render the gift valid and the other invalid, the courts will adopt the construction which will sustain it. *Stubblefield v. Peoples Bank of Bloomington,* 406 Ill. 374, 384; *Village of Hinsdale v. Chicago City Missionary Society,* 375 Ill. 220, 231; *Webb v. Webb,* 340 Ill. 407, 420; *Skinner v. Northern Trust Co.,* 288 Ill. 229, 232. The intention must be ascertained from the words of the will itself, the purpose being to arrive at the intention as expressed by its language and not an intention which may have existed in the testator's mind apart from such language but which he failed to express. *Turek v. Mahoney,* 407 Ill. 476, 482; *Appleton v. Rea,* 389 Ill. 222, 226; *Cahill v. Michael,* 381 Ill. 395, 400. Upon the completion of extensive hearings the chancellor wrote a thorough opinion, based upon which a detailed decree was entered. A careful study of the record, the briefs and authorities cited satisfies us that the findings and decree of the chancellor are right.

The provisions of the Act having reference to the gifts involved in this case are sections 59 and 60. By section 59 a hospital management committee shall have power to accept, hold and administer any property upon trust for purposes relating to hospital service.

347

Section 60 of the Act provides: "(1) Where property, other than property transferred to the Minister or to the Board of Governors of a teaching hospital, or to a Hospital Management Committee under section 6 or section 7 of this Act, is held on trust immediately before the appointed day, and the terms of the trust instrument authorize or require the trustees, whether immediately or in the future, to apply any part of the capital or income of the trust property for the purposes of any hospital to which section 6 of this Act applies, the trust instrument shall be construed as authorizing or, as the case may be, requiring the trustees to apply the trust property to the like extent and at the like times, for the purpose of making payments, whether of capital or income—(a) in the case of a hospital designated as a teaching hospital or included in a group of hospitals so designated, to the Board of Governors of that teaching hospital; (b) in the case of any other hospital, to the Regional Hospital Board for the area in which the hospital is situated or to the Hospital Management Committee for the hospital or for the group of hospitals in which it is comprised. (2) Any sums paid as aforesaid to any such Board or Committee shall, so far as practicable, be applied by them for the purposes specified in the trust instrument."

The Herefordshire Hospital functions as a hospital on the same premises as before the Act, with the same facilities and the same wards. In the large wards there is no payment and in the smaller wards some are pay beds and some amenity beds. If the patient wishes to have use of the smaller wards other than for medical reasons, there is payment. The wards bear the same plaques as they always bore. The other accommodations that were maintained prior to the Act are still maintained for substantially the same purpose. The hospital has medical officers, house surgeons and house

348

physicians. The management of the hospital is now carried on by the Herefordshire Hospital Management Committee. The Hospital Association itself has never been dissolved due to the fact that there are certain funds not transferred to the Minister of Health which the Association has been arranging to dispose of. The physical premises have been transferred to the Ministry of Health, but there have been no changes other than a change in management. The Leominster and District Hospitals function as a hospital on the same premises as before the Act. There have been no substantial changes in the premises, with the wards remaining the same and patients in the large wards being treated free, and a private ward and amenity beds, for which a charge is made. The operating room and other accommodations are there as before the passage of the Act. The hospital is now managed by the Management Committee. The hospital has a medical and surgical staff, a consultant-surgeon and an anesthetist. The Victoria Eye Hospital still operates on the same premises under the same name, with the elimination of the word "Incorporated." There have been no changes in the premises. There is little or no payment by any patient in the large wards and in the smaller wards. The private patients pay if they can afford to do so. The same ophthalmic surgeon is at the hospital as was there immediately before the Act. The Management Committee conducts the hospital since the effective date of the Act. Many of the members of the hospital management committees were formerly members of the governing boards of the hospitals when they were private institutions. Seven of the present members of the Management Committee were members of boards of the three hospitals prior to the passage of the Act.

Each of the three hospitals was what was known in England as a voluntary hospital. They were private

charitable enterprises and each was run by its own governing body which controlled the administration of the property and the functions of the hospital, including the selection and appointment of the medical staff and all other employees. Each of them had endowment funds of substantial amounts. Their income came from these endowments, from annual gifts, from payments by patients who could afford to pay and from contributory "schemes," which were a kind of voluntary insurance system somewhat similar to Blue Cross and other systems in this country. The specialists and consultants at the hospital gave their services free and any patient who could not afford to pay received his hospital care free. The voluntary hospitals had been for some 200 years the "heart of medicine" in England for the treatment of the acute sick. The Act dissolved the old governing bodies except as they might have other functions, not related to the hospitals, which they could carry on. None of the three governing boards has any powers with respect to the hospitals now being run on the premises which they formerly owned and operated, and none has attempted to exercise such power. The hospital properties are now owned by the Minister of Health and operated by the Management Committee as agent for the Regional Board in Birmingham.

 Appellants maintain that the testator's gifts under Article 30 of the will were to particular institutions and were to be used for particular purposes. The income was to be used for defraying current expenditures. Clearly, the gifts to the three hospitals are charitable gifts. Under Illinois law there can be no failure of such gifts so long as the charitable purpose embodied therein may be fulfilled. The particular mode or method of application of the gifts is not treated as controlling in the eyes of equity. *Heuser v. Harris*, 42 Ill. 425; *Crerar v. Williams*, 145 Ill. 625; *Jansen v.*

*Godair,* 292 Ill. 364; *Burke v. Burke,* 259 Ill. 262; *Webb v. Webb,* 340 Ill. 407. "The general intention of the testator in favor of charity will be allowed to prevail, even though his particular intention as to the manner of managing the gift falls to the ground." *Ingraham v. Ingraham,* 169 Ill. 432. The efforts of the courts of this State have always been to sustain a gift for charity if it can be done, and while our courts do not assume to exercise the prerogative powers which the courts of England have at times exercised, if a trust for charity is sufficiently certain to enable the courts, in the exercise of their ordinary chancery powers, to carry out the donor's charitable intent, they will not allow the trust to fail. *Heuser v. Harris,* 42 Ill. 425; *Kemmerer v. Kemmerer,* 233 Ill. 327.

 In this State the test of failure of the charitable gift involves the question of whether the charitable purpose embodied in the gift can be fulfilled. We agree with the chancellor that the testator's charitable purpose embodied in his gift to the three hospitals can be fulfilled. As the cases indicate, the rule with respect to charitable gifts is somewhat different than with respect to noncharitable gifts. The courts will make every effort to sustain a charitable gift, and changes in the mode of administration or management of the gift are not treated as controlling. Appellants call attention to the fact that during the lifetime of the testator the hospitals were administered and managed by a private board of managers and today they are administered and managed by the Herefordshire Management Committee under the Act. The important question is not who manages the hospitals but are they still functioning as hospitals, serving substantially the same people and furnishing the same hospital service and whether the funds will be applied for the benefit of the hospitals

351

as desired by the testator. Under Illinois law doubts will be resolved in favor of upholding the gifts.

We find that the testator's charitable purpose embodied in his gifts to the three hospitals can be fulfilled. The three hospitals continue to function as hospitals in the same premises, with the same facilities and serving the same people as they did prior to the effective date of the Act. In no substantial sense can it be said that the hospitals have ceased to exist. They continue to exist and function as hospitals as they always did. It is only the method of administration or management that has been altered or changed. Mr. Holland did not make the gifts to the board of managers of the hospitals or to any particular entity or administration, nor with any limitation that their use was conditioned upon any particular form of administration. The gifts were absolute and not upon any condition precedent or subsequent and without any gift over under any circumstances. The only qualification imposed by law would be that the income be used for the purposes of the hospital with respect to the principal of the trust fund. He specified only that the hospitals should use their respective shares as an endowment fund and that the income be used for the current expenditures of the respective beneficiaries. He left entirely unconditioned the matter of who was to apply the income or in what manner, other than it be expended on a current basis. Since he made these gifts in perpetuity, he must have assumed that the management or administration might change. He did not designate them as voluntary hospitals, or hospitals run by any particular board of managers, or in any particular fashion. He made the gifts to the hospitals by the names by which they were known in the area in which they were located. Section 60 of the Act provides, in substance, that property of a type herein involved shall be applied by the board or committee, so far as prac-

352

ticable, for the purposes specified in the trust instrument. The record shows that the gifts will be applied for the benefit of the three hospitals as desired by the testator.

■■■ The regulations promulgated under the Act establish that funds coming to the Management Committees under section 60 are to be accounted for and handled separately, and there are frequent admonitions in those regulations that they are trust funds and are to be applied in accordance with the terms of the trust instrument. The Act itself provides that any sums paid under section 60 to a board or committee shall, so far as practicable, be applied for the purposes specified in the trust instrument. It appears that the words "so far as practicable" were inserted in section 60 with the thought that being a statute of very wide application there might be gifts made attaching conditions to the use of property that it might not be possible to fulfill. In the instant case there are no such conditions. The testimony and the exhibits establish that the gifts will be applied to the benefit of the three hospitals in the manner desired by the testator. The Herefordshire Hospital Management Committee has filed an undertaking which is attached to the decree, stating unequivocally that monies received by the Committee will be applied for the benefit of the three hospitals in the manner specified in the will and the decree, and further providing that the principal of the Fund, when the same is distributed, will be maintained and the income only applied, as specified in the will and the decree. The fact that under the decree the funds will be applied by the Management Committee, which is a Committee appointed by the Minister of Health, does not in any sense make the application any the less charitable. The important fact is that the three hospitals are performing a charitable work, namely, the furnishing of hos-

pital service, and it was to aid such purpose that the gifts were made.

In *Heuser v. Harris,* 42 Ill. 425, the court was concerned with charitable gifts to the poor of Madison county and to a school district. Both of the gifts were upheld as charitable gifts despite the fact that in both instances the support of the poor and the maintenance of a school district were and are normal governmental functions. The county court was decreed to make and manage the funds for the benefit of the poor of Madison county. In *In re Estate of Graves,* 242 Ill. 23, the court upheld a charitable gift which was to be administered by the Board of South Park Commissioners in the erection and maintenance of a drinking fountain. In *Grear v. Sifford,* 289 Ill. App. 450 (petition for leave to appeal denied) a charitable gift was made to an institution known as the Union Academy of Southern Illinois, a private school. Subsequently, the functions of this private school were, for all practical purposes, assumed by a community high school, which was a tax-supported institution, and the trustees of the private school applied the income from this endowment fund to the support of the community high school. The court held that there was no failure of the charitable gift to the private school despite the use of the income from the endowment fund for the support of a tax supported community high school. In *Rush Medical College v. University of Chicago,* 312 Ill. 109, our Supreme Court approved transfer to and use by the university, an entirely different educational institution, of the charitable gifts that had been made to the Rush Medical School in order to carry out the latter's charitable purposes. The case was decided within the general equity powers of the court. The court said (117):

"The transfer of the property of the college to a similar charity under conditions which assure contin-

354

uation of the use of the property in accordance with the purposes of the charter of the college, so that the fulfillment of the charitable purpose will be accomplished and the efficiency of this educational institution increased, is not a diversion of the funds to a purpose foreign to that to which they were dedicated."

From the case of *In re Harrington's Will,* decided by the Appellate Division of the Supreme Court of New York, 276 N. Y. Supp. 868 (243 App. Div. 235), it appears that the testator gave to her niece the life use of certain real and personal property and the remainder (converted into money) at the death of the niece to the "Rome Hospital and the managers and trustees thereof by whatsoever name known in trust however to build with said monies and proceeds an annex or addition to said Rome Hospital building in memory of my late husband George A. Harrington *and for no other use or purpose* said annex or addition to be known as the 'Harrington Annex' or 'Harrington Addition.' " The "Rome Hospital" mentioned in the will was a charitable institution incorporated in 1884 and was operated as a charitable institution until January 1, 1929, when, for the annual rental of $1 and upon certain conditions and covenants all the real and personal property was leased to the City of Rome for two years, with renewal privileges. The lease continued until, by a deed of December 11, 1930, the lessor, for a consideration of $1, deeded the property to the City of Rome. The deed provided that the premises conveyed "shall either be maintained forever by the City of Rome as a municipal hospital, or if sold, the proceeds of the sale shall be used for the establishment of another municipal hospital *and for no other purpose,*" and that the hospital or its substitutes should bear the name "Rome Hospital and Murphy Memorial Hospital." Since that time the City of Rome has operated the property in connection

355

with the Murphy Hospital as a single municipal hospital. Decedent's will was dated in 1901 and she died in 1903. The Rome Hospital (the original charitable institution) had not been dissolved at the time the opinion was filed. It has never been operated as a hospital since it deeded its property to the City, but continued to exist for the purpose of administering certain trust funds. The surrogate held that the gift lapsed and that there was a lapsing of the legacy because it expressed no general charitable purpose such as would prompt the court to apply the *cy pres* doctrine if possible. The Appellate Division said (871):

"Primarily the gift was to an institution charitable by the very terms of its charter, and its work was one of the highest types of charity. . . . But the will, in the instant case, took effect in 1903, at the date of the death of testatrix. The Rome Hospital was then in existence, and as a legal entity, is still in existence, and then was, and still is, legally capable of accepting this gift. . . . The very real estate which it formerly owned is now being used as a hospital. What difference that it has changed hands and is now operated by the city of Rome? It is said, in answer to the question, that the city of Rome may use the money to pay nurses or buy drugs and thus defeat the whole aim of the testator, both in its memorial and in its charitable features, and that the only purpose that the gift will serve is to relieve the taxpayer's burden. I see only this one impediment in the way of carrying out the purposes of this charitable gift. It is the impediment that must always exist, whenever it is sought to attach a charitable gift to some one's property other than the testator's. If I choose to provide for the creation of a college or hospital, and make a valid will to that end, that is no one's business but the court's to see that the plan is carried out. But if I provide by will for annex-

356

ing a library to some one else's college or a sun parlor to some one else's hospital, my plan may be met with objection from the incidental donee. The owner of the property designed to be incidentally benefited by a charitable gift may renounce the gift so far as he is concerned, and no one can make him accept it. If the city of Rome, the present owner of the hospital building in question, does not want an annex or addition substantially as testatrix intended it, it need not have it. But if it is willing to accept it, no reason is apparent why the wishes of testatrix cannot be substantially carried out. . . . A further proceeding, either in Supreme Court or Surrogate's Court, may hereafter be had to apply the cy pres doctrine, and in that proceeding, with the proper parties in court, the court may direct the trustees of the original Rome Hospital in the carrying out of a plan to use the legacy in a manner substantially carrying out the benevolent aim of the testatrix."

From the language of the Holland will it appears that the testator had in mind only that the principal of the fund be kept intact and that the income be expended on a current basis. He did not specify that the income be used for any particular purpose or impose any limitation as to the type of expenditure. The only requirement is that the principal remain intact. The regulations comprehend that the gifts administered by the Hospital Management Committee are to be applied for such hospital purposes as the committee managing the hospital shall determine. The funds would be used for "general or special hospital purposes" or for "research" or for "laboratories" or for "extras or amenities." The determination of the specific hospital purposes for which the funds will be used will be made by the Hospital Management Committee, the agency administering the hospitals. The gifts would be used for

such hospital purposes or services as the committee managing the hospital would determine, and this is the intention that the testator had in mind. He left the funds to the hospital without specifying the purpose for which they were to be used, except that the income from the principal was to be expended on a current basis.

Appellants rely heavily on *Quimby v. Quimby,* 175 Ill. App. 367, and *Chicago Daily News Fresh Air Fund v. Kerner,* 305 Ill. App. 237. In the *Quimby* case the charitable donee had wholly ceased to carry on the work for which it was organized prior to the time that the bequest was to take effect. In the *Kerner* case the court said (244) : "The legatees having renounced the gifts, it does not take effect and is as if it had never been made." We agree with the appellees that these cases are not applicable to the case at bar. In this case there has been no failure of the gifts to the hospitals since the charitable purpose embodied in the gifts can be fulfilled. Appellants also cite *Board of Education v. City of Rockford,* 372 Ill. 442. There the question was whether a charitable gift of property for educational purposes to benefit persons in a particular area could be used for noneducational purposes to benefit a different class of persons. The case is not in point. In the instant case the appellees do not propose that the gifts to the hospitals be used for other than hospital services and the record shows that the gifts will be used for the purposes the testator desired to benefit.

Appellants assert that the exact question of the failure of a specific gift made to an English hospital which had been nationalized was decided by the Supreme Court of Rhode Island in the case of *Pennsylvania Co. v. Board of Governors of London Hospital,* 83 A.2d 881. That court held that the nationalization of these hospitals had brought about a failure of the gifts to two

358

former voluntary hospitals in London. The court in the Rhode Island case states that if the interests granted had been absolute interests, they would have passed to the Minister of Health or to the successor boards by virtue of the provisions of the Act. The court said (888):

"Finally we are unable to agree with the arguments of the English hospitals that, even if in the circumstances the gifts to them have failed, they are entitled to have this cause remanded to the superior court for the application of the doctrine of *cy pres*. It may be granted that the testator's will reveals a general charitable intent, Pell v. Mercer, supra, thus meeting that requirement for the application of such doctrine. However, in Section XI of his will the testator named the respondent churches as his residuary legatees saying: 'so that in case any of my preceding gifts, specially my gifts to Public purposes should fail . . . my property shall surely go, in such event, to the work of establishing the Knowledge & following of Jesus Christ among our American People.' Such provision in effect obviates the application of that doctrine since the testator himself shows clearly his own intent and the alternative disposition of his property in the event of the failure of the gifts referred to. In the circumstances we see no reason why the above-expressed intent of the testator should not be carried out. It is generally held that when a testator makes a specific alternative bequest to take effect if a primary charitable one fails, the doctrine of *cy pres* is not applied, but the estate is distributed in accordance with the testator's express direction. . . . Having determined, in view of the conditions appearing herein and the changes resulting from the passage of the health act, that the gifts to the English hospitals have failed and that this cause is not a proper one for an application.

of the *cy pres* doctrine under our statute, we find that the assets of the trust now in the hands of the complainant trustee and ready for distribution should be paid, in accordance with the express direction of the testator as contained in Section XI of his will . . . ."

The Rhode Island case is not applicable to the situation presented to us. The gifts to the three hospitals in the case at bar were absolute gifts, were vested equitable remainders and had vested prior to the passage of the Act. In the Rhode Island case the court found that the gifts were limited to specific uses and by express conditions as part of the essence of the gift so that they failed if such uses and purposes were not to be fulfilled. The Rhode Island opinion discloses that the court would have applied the gifts for the charitable donees under the *cy pres* doctrine except that there was an alternative disposition contained in the will.

 We agree with the contention of the appellees that the gifts to the three hospitals were absolute interests with possession and enjoyment only postponed for the purpose of letting in the interests of the individual life income beneficiaries. An estate is vested not only where there is an immediate right of present enjoyment but a present fixed right of future enjoyment. Possession and enjoyment were to take effect upon the happening of the event to occur, namely, the death of testator's brothers and sisters who were the life income beneficiaries. The postponement of possession and enjoyment was provided for as a convenience to the estate and not for reasons personal to the hospitals as legatees. The interests bequeathed to the hospitals were vested equitable remainders. *Scofield v. Olcott,* 120 Ill. 362; *Ashmore v. Newman,* 350 Ill. 64; *Continental Illinois Nat. Bank & Trust Co. v. Kane,* 308 Ill. App. 110.

 A court of equity has inherent powers with respect to charitable gifts within the general equity powers of the court, aside from the doctrine of *cy pres*. A court of equity within its general equity powers will act to supply any deficiencies in order to preserve the gifts. *Webb v. Webb,* 340 Ill. 407. In *Hitchcock v. Board of Home Missions,* 259 Ill. 288, the court said (298) : "It is sufficient to say that to sustain this gift does not require the exercise of any prerogative power of a nature sometimes exercised in England, but requires only the exercise of the ordinary jurisdiction of a court of equity." In *First National Bank of Chicago v. Elliott,* 406 Ill. 44, the court said (63) :

"It is usually where the charity has entirely failed that the extraordinary power of *cy pres* is used to designate another like charity to be aided or supported by the fund. Here, had the parties so desired, most of the relief could have been obtained by exercise of the court's inherent equity powers, although, since there. is a change in location and size of the institution, a decree based upon the doctrine of *cy pres* is proper."

 In our opinion the chancellor was correct in finding that the testator's dominant intent was for the general charitable purpose of promoting the health of the community in which he was born rather than to benefit the specific entities which owned and operated the three hospitals at the time of the execution of the will. The findings are amply supported by the evidence. It is significant that the testator made no provision for a gift over to his heirs of the gifts to the hospitals under any condition. Having made ample provision for his heirs he made the gifts to the hospitals absolute in form and without expressing any intention that his heirs should share therein. The voluntary hospitals such as the three hospitals in question, were in dire need of financial help at the time of the passage of the

Act. The hospitals are still functioning as hospitals and the application of Mr. Holland's gifts is not an application to a different charitable use but to the same charitable use. We are in accord with the chancellor's statement that "The wisdom or lack of wisdom of the adoption by the English Parliament of the National Health Service Act is of no concern to this court in determining the issues herein involved. Nor is this court endorsing, by this decision, the system known as 'Social Medicine.' . . . Regardless of the type of government under which people live, whether in accord with our concepts or not, the furnishing of medical and hospital service to human beings, is a worthy charitable purpose. If, as a matter of fact, there do exist deficiencies and inadequacies in the services rendered by the hospitals in question, the income from the funds bequeathed by the testator's will should help materially to lessen such deficiencies and should result in better hospital service to that community."

The chancellor, in finding for the hospitals, places his principal reliance on the *cy pres* doctrine. We are of the opinion that the relief afforded in the instant case could have been obtained by the exercise of the court's inherent equity powers. However, we agree with the appellees that a decree based on the doctrine of *cy pres* is proper. *First National Bank of Chicago v. Elliott,* 406 Ill. 44; *Village of Hinsdale v. Chicago City Missionary Society,* 375 Ill. 220; *Bruce v. Maxwell,* 311 Ill. 479. These hospitals are identical institutions designated by the testator, rendering the same type of medical service to the same community, in the same buildings and using the same facilities. Only management and ownership of the hospitals have changed by reason of the Act. The award of these funds to these hospitals under the present management and ownership is not just an application of these funds

to institutions of a similar charitable purpose, but to the identical purpose contemplated by the testator.

 The testimony of Miss Ethel Holland, sister of the testator and one of the individual defendants, was excluded by the chancellor as incompetent under section 2 of the Evidence Act [Ill. Rev. Stats. 1953, ch. 51, § 2; Jones Ill. Stats. Ann. 107.068]. Miss Holland, if permitted, would have testified that her brother had never given money to government-operated charities; that he was emotionally and politically opposed even to the mild policies of the Labour Party in the 1930s; that his only gifts for medical purposes were to voluntary hospitals; that his only gifts for medical purposes in the Herefordshire area were to the three hospitals named in his will; and that he never gave money to convalescent homes, homes for the aged, sick, etc., or to provide "amenities" in hospital service or for any hospital purpose not concerned with the provision of essential medical service for the acutely ill by voluntary hospitals; and that her brother thought of the Fund simply as an organization which aided the voluntary hospitals in London through contributions to the operating expenses. Appellants say that the proffered testimony would have confirmed that Mr. Holland's intention was to aid certain voluntary hospitals in Hereford and to aid the voluntary hospitals in London and that the situation brought about by the Act would have been anathema to him. Appellants argue that the Illinois courts make one clear exception to the apparent phraseology of section 2 of the Evidence Act, namely that the statute does not apply to contests concerning the relative rights of devisees as among themselves, so long as no one is asserting a right to the property which is founded outside or against the will. Citing *Pigg v. Carroll,* 89 Ill. 205;

*Mueller v. Rebhan,* 94 Ill. 142; *Fleming v. Mills,* 182 Ill. 464; *Alward v. Woodard,* 315 Ill. 150. Appellants assert that the position of Miss Holland and the other individual defendants falls clearly within the ambit of this exception because this is a controversy solely among various claimants under the testator's will and the individual defendants claim through a construction of the will and not against it. We find that the chancellor properly excluded the testimony of Miss Holland. Appellants are claiming not as legatees under the will but as heirs of the testator. Their theory is that upon failure of the specific gifts, there is a reverter to them as the testator's heirs-at-law.

 Appellants urge that the gift to the Fund fails because the testator's specific purpose, to aid the voluntary hospitals in London, can no longer be accomplished by the Fund either in the manner intended by the testator or otherwise. Our views as to the gifts to the three hospitals are applicable to the contentions concerning the Fund. The heirs say that what Mr. Holland had in mind was defraying the current expenditures of the voluntary hospitals; that the Fund had over a long period of time identified itself completely and exclusively with the voluntary hospitals of London; that it aided all of the voluntary hospitals; that the testator had no reason to differentiate in the use of the term "current expenditures" between the three hospitals and the Fund; and that the only reasonable construction of the language of the will is that the testator wanted the income intended for the Fund to be used for the principal activity of the Fund-payments towards the operating expenses of the voluntary hospitals in London. Appellants insist that the extinction of the voluntary hospitals of London makes it impossible for the Fund to carry out the purposes Mr. Holland intended, and that the nationalization of those

hospitals has created a situation in which the use of the income for "extras" connected with the nationalized hospitals and not for "current expenditures" is equally in conflict with the intention. They state that the testator could not have contemplated that the voluntary hospitals, rather than evolving throughout the years so as best to fulfill their function of treating the acute sick, would be exterminated and that these hospitals as social and charitable organizations would come to an untimely end. They state that for the reasons urged, the gifts must be held to have failed.

After the passage of the National Health Service Act the Fund continued its charitable existence corporatively and otherwise, and continued to function as a charitable institution. The Fund's corporate charter authorizes it to apply the capital and income of the funds and property of the corporation in or towards the support, benefit or extension of the hospitals of London, or some or any of them (whether for the general or any special purposes of such hospitals) and to do all such things as may be incidental or conducive to the attainment of these objects. In the charter the expression "hospitals of London" is defined to mean and include such present and future hospitals, convalescent homes, nursing homes, nursing institutions, lying-in institutions, dispensaries, medical missions, societies for the provision of surgical or medical aid or appliances and institutions for rest, relief or cure of sick persons as shall be instituted within London.

At the time the Holland will was made it was the administrative practice of the Fund, long established, to commingle in a common fund all the receipts (of the same general character as the trust estate net income and later endowment income involved in the instant case) that had come to it free of any restriction against what the practice entailed. Each year witnessed a size-

able aggregate sum put together in this way. It was and is the administrative practice to pay Fund administrative expenses and to disburse the various charities from the common fund without regard to the source from whence the disbursed sum came and without any studied effort to fit each disbursement into a pattern of what had gone on before with respect to disbursement of an equivalent sum. This practice arose out of a composite of experience and gradual growth over the years and developed from within the Fund as a desirable thing from a management standpoint, and therefore, originated and endures not at all by reason of outside compulsion. The practice tends towards minimizing the administrative expense burden and contributes to employment of its expendable funds to the charitable maximum. It is purely administrative in nature and the practice is observed where contributions to the Fund, by will or otherwise, are unaccompanied by restriction. We have no hesitancy in saying that under the will and the record in the case at bar the income becomes a part of this common fund when it is received and is subject to being so disbursed. The principal of the trust estate income never becomes a part of that common fund. When the testator of the will chose to say nothing in negation or prohibition of this common fund practice, he tacitly bestowed his approval on the method of administering if he was aware of the practice. If he was not aware of it, then he nevertheless bestowed his approval by reason of having directed that the income therefrom be used for "current expenditures."

The Act did not affect the property or management of the King Edward's Hospital Fund for London. None of its funds or properties, endowment or otherwise, was taken over under the Act. The corporation retains all of its original charter powers and continues to act

as a charitable corporation. The fund is now concerned principally with hospitals in the National Health Service which, by reason of the inclusion of hospitals formerly governmentally operated in addition to voluntary hospitals, has substantially expanded the possible scope of Fund assistance in regard to the number of hospitals that could benefit therefrom. The Fund still assists hospitals with the problem of obtaining nurses, with dietary problems, bookkeeping problems and the like. It renders financial assistance to 13 small hospitals in London which were not taken over by the Minister of Health. The Fund renders substantial assistance to convalescent homes and defrays part of the cost of emergency bed service. It makes substantial grants for amenities to patients and the purchase of special equipment in nationalized hospitals in London. It is in the process of setting up a college for the training of hospital administrators, nurses and dieticians.

In the field of financial grants to voluntary hospitals a conspicuous change took place when the Act went into operation. That type of charitable activity was and is substantially curtailed because of the elimination of private financing characteristic when the government took over many of the hospitals. Other charitable activities, or more intense activity in other fields, have been substituted. The long established administrative features, including resort to the common fund, are in vogue substantially as they were in 1936. The Fund's pre-eminence was attained in ways less spectacular than direct financial grants. Administrative practices are at the bottom of its greatest successes.

 There is no limitation in the will upon the nature or type of administration that should manage the fund, nor upon the manner in which the gifts are to be applied, except that the corpus remain as an en-

dowment fund with only the income thereof to be used for current expenditures. Nothing is said concerning the use to which the Fund shall put the income it is to receive out of the trust estate. With respect to the income the testator confines himself to the designation of the Fund by its correct name. The language used does not impose a restriction in the nature of a condition subsequent. The term "voluntary" in relation to hospitals does not appear in the will, nor is there any reference in the will to "direct" financial aid to hospitals nor to financial "grants" in aid of them. The term "current expenditures" has the signification that it meets obligations of a day-to-day character as they arise and not that it is something to be set aside for long range future requirements to await the obligation. In giving the direction he did about endowment income the testator was looking ahead many years, saying what he wanted done with the income then. It is unreasonable to assume he invoked the term "current expenditures" in any other sense than with reference to the expenditures that would be current then, the future times when endowment income would become available. It would be unreasonable to say that, looking forward, his firm disposition was that the income be expended then precisely as the Fund had been expending income from its other endowments in 1936. We agree with the chancellor that the words "current expenditures" mean the current expenditures of the Fund itself in the sense of the outlays it makes from its common fund, and that the language does not comprehend the current expenditures of the hospitals the Fund aids, nor any other institution it aids. Since conditions subsequent, especially as applied to charities, are not favored by the law, the intention to create such a condition must clearly appear from the instrument, and in case of reasonable doubt the vested estate will not be divested.

*Gredig v. Sterling,* 47 F.2d 832, 835, 14 C. J. S. Sec. 44, pp. 495, 496.

██ Appellants suggest that any plan which the court might work out could not be enforced by our courts but would be "subject to the future whim of the British Parliament." We recognize that after the delivery of the corpus of the trusts our courts would not have any effective control over the trust funds. That is true in any case where funds are delivered beyond the jurisdiction of the United States and where there are no parties within the jurisdiction subject to the directions of the court. Mr. Holland accumulated his wealth in the United States. He made four modest bequests to American charities for a total of $6,500. Of the private persons named legatees all but two are relatives and all but one are English residents. That one, an American, was given $1,000. The will disposed of a million dollar estate, all of it personalty, consisting of cash and securities. Mr. Holland visited England frequently. He knew that under the English constitutional system Parliament is supreme, yet he chose to leave nearly all of his estate to his relatives and charities in England. He and the draftsmen of the will knew that after the delivery of the corpus of the estate to individuals and institutions in England that Parliament might pass laws which would affect the funds so distributed. They also knew that whatever bequests were made to American legatees would be protected by the provisions of our state and federal constitutions.

The chancellor was right and the decree of the superior court of Cook county is affirmed.

*Decree affirmed.*

FRIEND and NIEMEYER, JJ., concur.