NO. 4-08-0162          Filed 11/21/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE CITIZENS NATIONAL BANK OF PARIS as | ) | Appeal from |
| Trustee of the La Fern L. Blackman | ) | Circuit Court of |
| Trust; as Trustee of the Ettoile Davis | ) | Edgar County |
| Trust; as Trustee of the Ruth Cook | ) | No. 06CH59 |
| Memorial Fund; and as Trustee of the | ) | |
| Gladys Stratton Trust; and THE EDGAR | ) | |
| COUNTY BANK & TRUST COMPANY OF PARIS, | ) | |
| ILLINOIS, as Trustee of the Samuel R. | ) | |
| Smith Trust, | ) | |
|     Plaintiffs-Appellees, | ) | |
|     v. | ) | |
| KIDS HOPE UNITED, INC., an Illinois Not- | ) | Honorable |
| for-Profit-Corporation, | ) | James R. Glenn, |
|     Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

In the 1960s, grantors La Fern L. Blackman and Ettoile Davis each executed a trust that benefitted the Edgar County Children's Home (the Home). The Blackman trust stated that the Home would continue to receive income from the trust until the Home "ceased to operate or exist." The Davis trust stated that the Home would continue to receive income from the trust until the Home ceased to function in its "present capacity." In 2003, the Home merged with defendants, Hudelson Children's Home and Family Services (Hudelson), now named Kids Hope United, Inc. (Kids Hope). In 2006, plaintiffs and trustee, Citizens National Bank of Paris (the Bank), filed a petition for instructions, seeking a determination that the gifts to the Home lapsed because

the Home "ceased to exist" and ceased to function in its "present capacity" following the merger. Kids Hope, as the continuing entity following the merger, argued that the gifts should not lapse and it should continue to receive income from the trust. Both the Bank and Kids Hope filed for summary judgment. The court granted summary judgment to the Bank, finding that, as set forth in section 11.50(a)(2) of the Business Corporation Act of 1983 (Act) (805 ILCS 5/11.50(a)(2) (West 2006)), the restrictive conditions that each respective testator placed on her gift came to pass. We reverse and remand.

## I. BACKGROUND

A. Relevant History of the Home and Kids Hope

The Home was incorporated in the State of Illinois in 1898. Pursuant to its original charter, it was established as an institution for the education of the dependent children in Edgar County, Illinois, to exercise the custody and maintenance of such children and to provide permanent homes for them in approved private families. In 1900, the Home erected a building for this purpose on Eads Avenue in Paris, Illinois.

On August 15, 1980, an amendment to the Home's articles of incorporation changed its object to providing

"services to children and youth in the

fields of health, welfare[,] and education in

the State of Illinois, including multi-treat-

- 2 -

ment and educational programs for emotionally handicapped boys and girls of all races in residential treatment centers, day treatment services, counseling services to family, and such other related auxiliary services as are necessary or desirable from time to time to accomplish these purposes; and to own or lease property, establish and maintain residential treatment centers, homes, schools[,] and other facilities required."

This was for the purpose of allowing the Home to become a residential placement resource for children throughout the State and to receive state funding. It is unclear whether the Home actually ceased operating as a traditional orphanage in 1980, or whether it operated in a manner akin to the broader mission for some time.

The Home created a not-for-profit corporation, known as the Children's Home Endowment Fund, Paris, Illinois (the Fund), to hold the Home's property and finances. In 1993, various pieces of property, including the property on Eads Avenue, were transferred into the Fund.

On July 1, 2003, the Home merged with Hudelson pursuant to a merger agreement. In the agreement, Hudelson "guaranteed that [the Home's] mission of working with children in Edgar and

the surrounding counties will be continued."  On March 25, 2005, the real estate owned by the Fund was transferred to Hudelson. On February 3, 2005, Hudelson changed its name to "Kids Hope." Shortly thereafter, the facility on Eads Avenue closed.  This property was sold on June 16, 2006.  Kids Hope continues to own real estate in Edgar County in the form of two tracts of farmland it received from estates.

Kids Hope has families in Edgar County who serve as approved foster homes.  Kids Hope offers services to some minors in abused and neglect cases in Edgar County and has representatives who appear in Edgar County juvenile court.

B. Blackman Will and Trust

La Fern L. Blackman died on July 11, 1967.  She left a last will and testament dated July 23, 1961.  The will states in pertinent part:

"I give, devise and bequeath any and all farm land that I may own at the time of my death to my sister, ETTOILE DAVIS, for and during her natural life only ***[.]

After the death of my sister, ETTOILE DAVIS, all of my farm land is to go to THE CITIZENS NATIONAL BANK OF PARIS, Paris, Illinois, as trustee***. *** From the income of said farm land said trustee shall give

- 4 -

twenty-five per cent (25%) thereof to the Trustees of the EMBARRASS CEMETERY *** and the remaining seventy-five per cent (75%) of said net income is to be given to the EDGAR COUNTY CHILDREN'S HOME, Paris, Illinois, they to use the same as they deem best for said home.  _In the event either or both of the aforesaid organizations should cease to operate or exist_, then said bank as trustee is to distribute said portion or portions of said net income to such charitable organization or organizations as it deems worthy of said money."  (Emphasis added.)

### C. Davis Will and Trust

Ettoile Davis died on April 27, 1971.  She also left a will, dated December 4, 1968.  The will states in pertinent part:

"I give, devise, and bequeath any an all farm land that I may own, at the time of my death, to the *** Bank as trustee***. ***

The net income from the above mentioned land is to be disposed of as follows:

Twenty-five per cent (25%) to the TRUSTEES OF THE EMBARRASS CEMETERY***.  *** The remaining seventy-five per cent (75%) of said

- 5 -

net income is to be given to THE EDGAR COUNTY CHILDREN'S HOME, an Illinois Corporation, Paris, Illinois. In the event either of the aforesaid organizations shall cease to function in its present capacity, then the part of the trust fund which would have gone to this organization shall be divided equally between the FIRST METHODIST CHURCH OF PARIS MEMORIAL FOUNDATION, INC., THE EDGAR COUNTY CHAPTER OF THE AMERICAN CANCER SOCIETY, and THE EDGAR COUNTY HEART ASSOCIATION." (Emphasis added.)

## D. Procedural History

On December 26, 2006, in its status as trustee of the La Fern L. Blackman Trust, the Ettoile Davis Trust, and several other trusts not party to this appeal, the Bank filed a petition for instructions. In count I, concerning the Blackman trust, the Bank stated it believed the Home "ceased to exist." The Bank asked the trial court to determine whether or not the Home ceased to exist, and if so, it sought instruction "pursuant to 'cy-pres' doctrine" as to where to distribute the 75% of the annual net income of the Blackman trust, which Blackman bequeathed to the Home.

In count II, concerning the Davis trust, the Bank again

stated it believed the Home had ceased to exist.  The Bank asked the trial court to determine whether or not the Home had ceased to exist, and if so, it sought approval and authority to distribute 75% of the annual net income of the Davis trust to the First Methodist Church of Paris Memorial Foundation, Inc.; the Edgar County Chapter of the American Cancer Society; and the Edgar County Heart Association equally.

On April 5, 2007, Kids Hope filed its response to the petition for instructions denying the Home ceased to exist for purposes of receiving the trust incomes from the trusts.  On July 9, 2007, the Bank filed a motion for summary judgment.  On July 10, 2007, Kids Hope filed a motion for summary judgment, and the parties filed an agreed statement of facts.  The trial court held no oral arguments on either motion for summary judgment.

On August 13, 2007, the trial court sent a letter to the parties setting forth its decision in favor of the Bank and against Kids Hope.  In relation to the Blackman will, the court found the Home had "ceased to exist" as a result of its merger with Hudelson (now Kids Hope).  The court cited section 11.50(a)(2) of the Act, which states:

> "(2) The separate existence of all corporations parties to the plan of merger or consolidation, except the surviving or new corporation, shall cease."  805 ILCS

- 7 -

5/11.50(a)(2) (West 2006).

The court further found, in relation to the Davis will, the Home ceased to function as it did at the time of the testators' death when it merged with Kids Hope and when the building on Eads Avenue closed. The court ordered the Bank, as trustee of the Blackman and Davis trusts, to proceed in accordance with the successor beneficiary provisions of their respective wills. Distribution under the other three trusts, not a party to this appeal, would be in accord with the cy pres doctrine.

On October 29, 2007, the trial court filed an order based on the court's letter. In the order, the court found, "pursuant to Supreme Court Rule 304 (210 Ill. 2d R. 304), there is no just reason for delaying either enforcement or appeal" in regard to "count I involving the LAFERN [sic] L. BLACKMAN TRUST and count II involving the ETTOILE DAVIS TRUST."

On November 20, 2007, Kids Hope filed a motion after judgment in a nonjury case. In the motion, Kids Hope asked the trial court for a rehearing on the Bank's motion for summary judgment and to vacate its order of summary judgment. The court held a hearing on this motion on February 11, 2008. In an order dated February 19, 2008, the court again found Kids Hope was not entitled to continue to receive income from the Blackman or Davis trusts because the Home had ceased to exist. This appeal followed.

- 8 -

## II. ARGUMENT

Kids Hope contends the trial court erred in granting summary judgment to the Bank in regard to both Blackman's gift and Davis's gift. "Summary judgment is proper where the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, reveal there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." State Farm Mutual Automobile Insurance Co. v. Illinois Farmers Insurance Co., 226 Ill. 2d 395, 400, 875 N.E.2d 1096, 1099 (2007). Whether the entry of summary judgment was appropriate is a matter reviewed de novo on appeal. State Farm, 226 Ill. 2d at 400, 875 N.E.2d at 1099.

### A. Blackman's Trust: Was Summary Judgment Proper on the Ground That the Home "Ceased To Exist"?

#### 1. General Rule: Merger Does Not Cause Gift To Lapse

In regard to whether Kids Hope should continue to receive income from Blackman's trust, Kids Hope contends that the trial court should have relied on the general rule, set forth both in statute (805 ILCS 5/11.50(a)(4) (West 2006)) and in common law (In re Estate of Fuller, 10 Ill. App. 3d 460, 464-65, 294 N.E.2d 313, 316 (1973)), that the merger of two charities typically does not cause a bequest to either of the original charities to lapse.

Section 11.50 of the Act, subsections (a)(1) and

(a)(4), provide in pertinent part:

> "(1) The several corporations parties to the plan of merger *** shall be a single corporation, which[] *** is that corporation designated in the plan of merger as the surviving corporation***.

> * * *

> (4) Such surviving or <u>new</u> <u>corporation</u> <u>shall</u> <u>thereupon</u> <u>and</u> <u>thereafter</u> <u>possess</u> <u>all</u> <u>the</u> <u>rights</u>, <u>privileges</u>, <u>immunities</u>, <u>and</u> <u>franchises</u>, *** <u>of</u> <u>each</u> <u>of</u> <u>the</u> <u>merging</u> *** <u>corporations</u>; <u>and</u> <u>all</u> <u>property</u>, real, personal, and mixed, *** <u>and</u> <u>all</u> <u>and</u> <u>every</u> <u>other</u> <u>interest</u>, of or belonging to or due to each of the corporations so merged *** shall be taken and deemed to be transferred to and vested in such single corporation without further act or deed[.]"  (Emphases added.)  805 ILCS 5/11.50(a)(1), (a)(4) (West 2006).

The <u>Fuller</u> court held that a bequest to a not-for-profit corporation running a hospital did not lapse when that corporation merged into a similar corporation that continued to operate that hospital together with another hospital.  <u>Fuller</u>, 10 Ill. App. 3d at 465, 294 N.E.2d at 316; see also <u>In re Estate of</u>

*Trimmer*, 29 Ill. App. 3d 209, 213, 330 N.E.2d 241, 243 (1975) (not finding a failure of legacy where no resrictive language appeared in the will). The *Fuller* court's rationale was that the structural and managerial changes that occurred when the original corporation merged with the new corporation were not important in determining whether the new corporation would be able to carry out the purposes of the bequest. *Fuller*, 10 Ill. App. 3d at 464, 294 N.E.2d at 316.

2. What Did Blackman Mean by "cease to operate or exist"?

The general rule regarding a merger's effect on a bequest as set forth in section 11.50(a)(4) of the Act and in *Fuller* does not control if the grantor places a restrictive condition in the trust to otherwise cause the gift to lapse. See *Trimmer*, 29 Ill. App. 3d at 212-13, 330 N.E.2d at 243-44 (gift to original legatee church would have passed to merged church if restrictive condition in trust prohibiting change of affiliation had not come to pass). Kids Hope argues that the trial court erred in finding that the restrictive condition in the Blackman trust, "[i]n [the] event either or both of the aforesaid organizations should cease to operate or exist, then said bank as trustee is to distribute said portion *** to such charitable organization[s] *** as it deems worthy," came to pass in 2003 when the Home merged with Hudelson, now named Kids Hope. (Emphasis added.) Again, section 11.50(a)(2) of the Act states:

"(2) The separate existence of all cor-

porations parties to the plan of merger[,]

*** except the surviving or new corporation,

shall cease."  (Emphasis added.)  805 ILCS

5/11.50(a)(2) (West 2004).

"The cardinal rule of construction is to ascertain the intention of the testator from the will as a whole and to give effect to it, unless the intention is contrary to law or public policy."  Fuller, 10 Ill. App. 3d at 464, 294 N.E.2d at 316.  To determine a testator's intent, a court must consider the plain and ordinary meaning of the words used, and the intent must be determined by considering the entire document.  First National Bank of Chicago v. Canton Council of Campfire Girls, Inc., 85 Ill. 2d 507, 514, 426 N.E.2d 1198, 1201 (1981).  If the testator's intent may be determined from the language of the trust document alone, without reference to the rules of construction, there is no need to use them.  Campfire Girls, 85 Ill. 2d at 514, 426 N.E.2d at 1201.  However, when dealing with a charitable trust in particular, the language used is to be given a liberal construction and one favorable to its purpose.  In re Will of Hagan, 234 Iowa 1001, 1007, 14 N.W.2d 638, 641-42 (1944) (Hagan's Will); see also Fuller, 10 Ill. App. 3d at 463-64, 294 N.E.2d at 315-16 (endorsing Hagan's Will).  The law looks with favor upon charitable trusts, and liberal rules of construction will be

applied to sustain them.  <u>First National Bank of Chicago v. King</u>
<u>Edward's Hospital Fund</u>, 1 Ill. App. 2d 338, 351, 117 N.E.2d 656,
662 (1954).  The court may also consider surrounding circum-
stances at the time the instrument was executed, to the extent
that they may aid in determining the testator's intention in
using certain language.  <u>Campfire Girls</u>, 85 Ill. 2d at 514, 426
N.E.2d at 1201.

Blackman executed the trust instrument in 1961, wherein
she stated that the Home was to receive income from the trust
unless it should "cease to operate or exist."  In 1973, the
<u>Fuller</u> court endorsed two earlier cases, one from 1954 and one
from 1944, which held that a charity did not "cease to exist" for
the purposes of receiving a bequest unless the new corporation
with which the original charitable organization had merged was no
longer suited to carry out the purposes of the bequest.  <u>Fuller</u>,
10 Ill. App. 3d at 463-64, 294 N.E.2d at 315-16, citing <u>King</u>
<u>Edward's Hospital</u>, 1 Ill. App. 2d 352, 117 N.E.2d at 662, and
<u>Hagan's Will</u>, 234 Iowa at 1007-08, 14 N.W.2d at 642.  The instant
case bears some similarity to both <u>Hagan's Will</u> and <u>King Edward's</u>
<u>Hospital</u>.

In <u>Hagan's Will</u>, the testator executed a trust in 1930,
the income of which was to be divided equally between two col-
leges, Drake University and Penn College, for the purpose of
providing annual scholarships.  <u>Hagan's Will</u>, 234 Iowa at 1002,

- 13 -

14 N.W.2d at 639.  The trust contained a clause that stated: "'Should either Drake University or Penn College <u>cease</u> <u>to</u> <u>exist</u>, the income from said trust fund shall be turned over to the surviving institution.'"  (Emphasis in original and omitted.) <u>Hagan's Will</u>, 234 Iowa at 1002, 14 N.W.2d at 639.  In 1933, due to the economic pressures of the Great Depression, Penn College sought to organize as a new corporation, William Penn College. <u>Hagan's Will</u>, 234 Iowa at 1004, 14 N.W.2d at 640.  In 1934, trustees of a mortgage owed by Penn College foreclosed on the mortgage, and William Penn College subsequently obtained deeds to the mortgaged property following a foreclosure sale.  William Penn College paid the mortgage debt.  <u>Hagan's Will</u>, 234 Iowa at 1005-06, 14 N.W.2d at 641.  The court found that the phrase "cease to exist" meant "cease to exist as an educational institution."  <u>Hagan's Will</u>, 234 Iowa at 1007, 14 N.W.2d at 642.  The court noted that Penn College did not "cease to exist" as an educational institution merely because a different corporation took over the legal title and business management of the college. <u>Hagan's Will</u>, 234 Iowa at 1008, 14 N.W.2d at 642.

In <u>King Edward's Hospital</u>, the testator was born in Britain but moved to the United States as a young man.  The testator executed a trust, the income of which was to be distributed to several charities, including several hospitals in Britain.  <u>King Edward's Hospital</u>, 1 Ill. App. 2d at 342-44, 117

- 14 -

N.E.2d at 658. Ten years after the testator's death, the British parliament passed the National Health Service Act, which transferred control over the physical premises of Britain's hospitals to the Minister of Health. King Edward's Hospital, 1 Ill. App. 2d at 344-45, 117 N.E.2d at 658-59. In 1949, First National Bank of Chicago filed a complaint as trustee, seeking instructions as to whether the nationalization of Britain's hospitals and the socialization of Britain's medical care in general caused the named hospital's charitable interests to lapse. King Edward's Hospital, 1 Ill. App. 2d at 345, 117 N.E.2d at 659. The testator's heirs at law joined in the case and argued the named hospital ceased to exist and the testator's intent of defraying the individual hospitals' expenditures could no longer be carried out because the British government assumed the costs of health care. King Edward's Hospital, 1 Ill. App. 2d at 346-47, 117 N.E.2d at 659-60. The court disagreed, stating that "[i]n no substantial sense [could] it be said that the hospitals [had] ceased to exist," as they still functioned as hospitals. King Edward's Hospital, 1 Ill. App. 2d at 352, 117 N.E.2d at 662. The court reasoned that, since the testator made the gifts in perpetuity, he assumed that the management or administration of the hospitals might change. King Edward's Hospital, 1 Ill. App. 2d at 352, 117 N.E.2d at 662. The court also stated: "'The general intention of the testator in favor of charity will be allowed to

prevail, even though his particular intention as to the manner of managing the gift falls to the ground.'" King Edward's Hospital, 1 Ill. App. 2d at 351, 117 N.E.2d at 661, quoting Ingraham v. Ingraham, 169 Ill. 432, 451, 48 N.E. 561, 566 (1897).

We interpret Blackman's use of the phrase "cease to operate or exist" to mean that the charity is no longer suited to carry out the general purposes of the bequest. Common law around the time the trust was executed favored this interpretation. When the original corporation, the Home, merged with Hudleson, now named Kids Hope, in 2003, the new corporation guaranteed in the merger agreement that "[the Home's] mission of working with children in Edgar and the surrounding counties will be continued." (Emphases added.) Hence, the merger did not hinder the surviving corporation's ability to carry out the purposes of Blackman's original bequest. The merger cannot be said to have caused the Home to "cease to operate or exist" as Blackman meant those words.

In contrast, the language in Blackman's trust fails to indicate that she meant for the phrase "cease to operate or exist" to mean "cease to exist" as a "separate" corporate entity. Blackman did not use the phrase "cease to operate or exist" to denote the Home's corporate status. As such, the trial court erred in finding that the Home "ceased to operate or exist" as a result of the 2003 merger.

- 16 -

B. Davis's Trust: Was Summary Judgment Proper on the Ground That
   the Home "cease[d] to function in its present capacity"?

As noted above, Davis placed a restriction on her gift to the Home in that the Home would no longer receive income from the trust if it "cease[d] to function in its present capacity." The trial court acknowledged in its written findings that "the agreed statement of facts does not indicate exactly how [the Home] functioned at the time the trust was executed or at the time of the testator's death." Nevertheless, the court found that the Home ceased to "function in its present capacity" when the Home (1) merged with Kids Hope in 2003 and (2) subsequently closed the building on Eads Avenue that served as the original orphanage. Kids Hope contends the court erred in granting summary judgment because a genuine issue of material fact still remained as to whether Kids Hope, as the surviving corporation, still functioned in the same capacity as the Home functioned at the time of the trust's execution in 1968.

Summary judgment in favor of the Bank is not proper based on the theory that the Home ceased to function in its "present capacity" when it entered the 2003 merger. Nothing set forth in the agreed statement of facts demonstrates that the functioning of the charity changed at the time of the merger in terms of the charity's mission, the type of children served, or the manner in which the Home served these children. To the contrary, the merger agreement stated that the new entity "guar-

- 17 -

anteed that [the Home's] mission of working with children in Edgar and the surrounding counties [would] continue[]." The Bank's argument that the Home ceased to function in its present capacity because it "ceased to exist" following the merger also fails, as discussed in the first section of our analysis.

Likewise, we are not convinced that the 2006 closure of the flagship building on Eads Avenue in and of itself means that the Home ceased to function in its "present capacity." The information contained in the agreed statement of facts is insufficient to secure summary judgment on this ground. At what date did the building on Eads Avenue stop serving as a traditional orphanage? Surely, it was not as recent as 2006 when the building closed. The agreed statement of facts indicates that the Home stopped functioning as a traditional orphanage long before the charitable corporations merged or the house on Eads Avenue closed, and perhaps the transition began during Davis's lifetime. Regardless, we cannot say as a matter of law that the closure of the Eads building would mean that the Home ceased to function in its "present capacity." The phrase "present capacity" is ambiguous in that it is not clear how literally Davis intended the phrase to be taken. If the new charitable corporation continued to provide placement and educational services for the dependent children of Edgar County and the surrounding counties, yet was based in a different structure, would the charity still operate

in the same capacity?  The building on Eads Avenue was over 100 years old, and it seems improper to condition Davis's bequest on the maintenance of a particular building rather than the mission of charity that building once housed.  See Trimmer, 29 Ill. App. 3d at 211-12, 330 N.E.2d at 242-43 (where bequest to original church passed to merged church of the same affiliation, even though the merged church had a new name and met in a new location).

In re Estate of Beck, 272 Ill. App. 3d 31, 649 N.E.2d 1011 (1995), the case upon which the Bank relies, is distinguishable.  Beck involved an unusual set of circumstances where the original legatee never existed as named in the trust, and the charity that the trial court determined to be the intended legatee was an orphanage that closed eight years before the testator executed the trust.  Beck, 272 Ill. App. 3d at 36, 649 N.E.2d at 1015.  The new corporation seeking to benefit from the trust, a general children's charity, never merged with the intended legatee; rather, the new corporation merely acquired the assets of the intended legatee.  Beck, 272 Ill. App. 3d at 38, 649 N.E.2d at 1016; see also Gray v. Mundelein College, 296 Ill. App. 3d 795, 808, 695 N.E.2d 1379, 1388 (1998) (corporation that merges with another typically takes on the original corporation's rights and liabilities, whereas a corporation that merely purchases the assets of another does not).  The new charity provided

services such as foster care, adoption, counseling for families, and medical care for at-risk infants. Beck, 272 Ill. App. 3d at 37, 649 N.E.2d at 1015. The court stated that the new charity did not have a "similar *** purpose and function" to that of the original orphanage, as required in the will. Beck, 272 Ill. App. 3d at 37, 649 N.E.2d at 1015. However, the finding in Beck does not mandate summary judgment in the instant case. Aside from the fact that we are not bound by the Fifth District's determination of what constitutes a "similar function," the circumstances of Beck are different in that they involve a clear demarcation from one organization to another and from one mode of functioning to another, whereas the instant case involves a continuing charitable entity and a gradual evolution of the charitable services provided.

Finally, we address the intimations made by the Bank that the parties' submission of an agreed statement of facts, and the fact that both parties filed for summary judgment, should somehow entitle at least one of the parties to summary judgment. First, we note that a genuine issue of material fact exists not only where the facts are disputed but also where reasonable minds could draw different inferences from undisputed facts. See, e.g., In re Estate of Ciesiolkiewicz, 243 Ill. App. 3d 506, 510, 611 N.E.2d 1278, 1282 (1993). Second, we note the possibility that the agreed statement of facts simply does not set forth

- 20 -

sufficient grounds to entitle either side to judgment as a matter of law.

III. CONCLUSION

For the aforementioned reasons, we reverse and remand the trial court's grant of summary judgment.

Reversed and remanded

STEIGMANN, J., concurs.

KNECHT, J., dissents.

JUSTICE KNECHT, dissenting:

I would affirm the trial court. Hudelson was the surviving corporation after the merger and not the Home. The Home ceased to exist after the merger. Hudelson, as the surviving corporation, may have acquired certain rights and responsibilities of the Home after the merger, but this cannot trump Blackman's will, which stated in the event the Home should cease to operate or exist, then the Bank as trustee was to distribute the trust's income to other worthy charitable organizations.

Under the provisions of section 11.50(a)(2) of the Act (805 ILCS 5/11.50(a)(2) (West 2006)), the Home ceased to exist. It is not a question of ownership of assets or rights and property of the Home but of the existence of the Home. It is also apparent the Home ceased to operate. Because the Home no longer exists or operates, the alternate distribution should apply, as Blackman intended.

As to the Davis will, the trial court found the Home ceased to function in its present capacity when it ceased to exist upon its dissolution and merger and when the building housing Edgar County children since 1900 was closed and sold. The Davis will provided for an alternate distribution in the event the Home ceased to function in its present capacity.

Hudelson could not function in the "present capacity" of a nonexistent entity nor could it do so by closing and selling

- 22 -

the building where the Home previously functioned as a home for Edgar County children.

Both the Bank and Kids Hope filed for summary judgment. Both submitted an agreed statement of facts. Both had opportunity for input and approval of those facts. Both asserted to the trial court there were no material questions of fact at issue. Once the Bank prevailed, Kids Hope changed course. It now claims there are more facts to present.

No additional facts are necessary. On this record, the trial court concluded correctly both Blackwell and Davis made their intent clear, and their intent should be honored.

The Home no longer functioned as it did when Davis made her gift, and it no longer operated or existed as it did when Blackwell made her gift. While reasonable minds may sometimes draw different inferences from undisputed facts, we should not permit our reasonable minds to alter the testators' intent.