(No. 107787.

THE CITIZENS NATIONAL BANK OF PARIS, as Trustee of the La Fern L. Blackman Trust, and as Trustee of the Ettoile Davis Trust, Appellant, v. KIDS HOPE UNITED, INC., an Illinois Not-for-Profit Corporation, Appellee (Lisa Madigan, Attorney General of the State of Illinois, Intervenor-Appellee).

*Opinion filed December 17, 2009.*

Richard M. Kash, Jr., of Fruin & Kash, of Paris, for appellant.

David C. Nelson and E. Lee Waite II, of Dilsaver & Nelson, of Mattoon, for appellee.

Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Richard S. Huszagh and Ann Chalstrom, Assistant Attorneys General, of Chicago, of counsel), intervenor-appellee.

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Thomas, Kilbride, Garman, and Burke concurred in the judgment and opinion.

Justice Karmeier dissented, with opinion.

## OPINION

Petitioner Citizens National Bank of Paris (the Bank), as trustee of two charitable trusts that benefitted the Edgar County Children's Home (ECCH), petitioned the circuit court of Edgar County for instructions following the merger of ECCH with a similar charitable entity to form Kids Hope United—Hudelson Region (Kids Hope). In its petition, the Bank sought a determination that, as a result of the merger, the gifts to ECCH had lapsed. The Bank and respondent Kids Hope submitted an agreed statement of facts and filed cross-motions for summary judgment. The circuit court granted the Bank's motion, denied Kids Hope's motion, and directed the Bank to proceed in accordance with the alternate distribution provisions pertaining to each trust. Kids Hope appealed, and a divided appellate court reversed. 386 Ill. App. 3d 1084. We allowed the Bank's petition for leave to appeal. 210 Ill. 2d R. 315. For the reasons set forth below, we affirm the judgment of the appellate court.

## I. BACKGROUND

La Fern L. Blackman died on July 11, 1967. Her will, dated July 23, 1961, provided that, after the death of her sister, Ettoile Davis, the Bank would hold her farmland in trust and pay 75% of the income from the farmland to ECCH and the other 25% to the trustees of the Embarrass Cemetery in Edgar County. The will further provided: "In [the] event either or both of the aforesaid organizations should cease to operate or exist, then said bank as trustee is to distribute said portion or portions of said net income to such charitable organization or organizations as it deems worthy of said money."

Ettoile Davis, Blackman's sister, died on April 27, 1971. Her will, dated December 4, 1968, directed the Bank to hold her farmland in trust and give 75% of the net income to ECCH and the other 25% to the trustees of the Embarrass Cemetery. The will further provided: "In the event either of the aforesaid organizations shall cease to function in its present capacity, then the part of the trust fund which would have gone to this organization shall be divided equally between the FIRST METHODIST CHURCH OF PARIS MEMORIAL FOUNDATION, INC., THE EDGAR COUNTY CHAPTER OF THE AMERICAN CANCER SOCIETY, and THE EDGAR COUNTY HEART ASSOCIATION."

ECCH was incorporated in Illinois in 1898. Its charter stated it was formed to "establish an institution for the education of dependent children of Edgar County, Illinois, and for the custody and maintenance of such children and to provide permanent homes for them in approved private families." In 1900, ECCH erected a building for this purpose on Eads Avenue in Paris, Illinois.

In 1980, ECCH amended its articles of incorporation to allow it to become a residential placement resource for children throughout Illinois and to receive state funding. As a result of the amendment, ECCH's object was to:

"provide services to children and youth in the fields of health, welfare and education in the State of Illinois, including multi-treatment and educational programs for emotionally handicapped boys and girls of all races in residential treatment centers, day treatment services, counseling services to family, and such other related and auxiliary services as are necessary or desirable from time to time to accomplish these purposes; and to own or lease property, establish and maintain residential treatment centers, homes, schools and other facilities required."

ECCH created a not-for-profit corporation, the Children's Home Endowment Fund (the Fund), to hold its property and finances. In 1993, various pieces of property, including the property on Eads Avenue, were transferred into the Fund.

On July 1, 2003, ECCH merged with the Hudelson Baptist Children's Home (Hudelson) pursuant to a merger agreement between the two not-for-profit corporations. The agreement provided that, "effective July 1, 2003 *** ECCH will dissolve as an entity and merge all its assets and programs into [Hudelson]," and that ECCH's employees would become Hudelson's employees. In the agreement, Hudelson "guarantee[d] that ECCH's mission of working with children in Edgar and the surrounding counties will be continued for as long as it is financially feasible to do so."

In 2004 the real estate held by the Fund was transferred to Hudelson, which changed its name, in 2005, to Kids Hope. The Eads Avenue facility was closed, and in June 2006 was sold to the Paris school district.

According to the parties' agreed statement of facts, Kids Hope "has families in Edgar County who serve as approved foster homes." Kids Hope also offers services to minors in abuse and neglect cases in Edgar County, and its representatives appear in Edgar County juvenile court.

In December 2006 the Bank, as trustee of the Blackman and Davis trusts, filed a petition for instructions in

the Edgar County circuit court. In count I, relating to the Blackman trust, the Bank noted the 2003 merger of ECCH with Hudelson, now Kids Hope, and stated that it believed ECCH had "ceased to exist." The Bank asked the court to determine whether this was the case and, if so, where the income payable to ECCH should be distributed under the *cy pres* doctrine. In count II, concerning the Davis trust, the Bank again stated it believed that ECCH had "ceased to exist." The Bank asked the circuit court to determine whether this was true and, if so, to approve the distribution of 75% of the trust's net income to the alternate beneficiaries named in the Davis will.[1]

The Bank and Kids Hope submitted an agreed statement of facts and filed cross-motions for summary judgment.[2] The circuit court granted the Bank's motion and denied Kids Hope's motion. With regard to the Blackman trust, the court found that ECCH had "ceased to exist" as a result of the merger with Hudelson. Relying on section 11.50(a)(2) of the Business Corporation Act (805 ILCS 5/11.50(a)(2) (West 2006)),[3] the court reasoned that because the merger agreement identified Hudelson, not

---

[1]The petition included three additional counts regarding other trusts which benefitted ECCH. These additional counts are not part of this appeal.

[2]In its memorandum in support of its motion, Kids Hope, citing *Stoner Mfg. Corp. v. Young Men's Christian Ass'n of Aurora*, 13 Ill. 2d 162 (1958), and portions of the Charitable Trust Act (760 ILCS 55/1 *et seq.* (West 2006)), brought to the circuit court's attention that the Illinois Attorney General might be "a necessary party to this action." The circuit court ruled, however, that the Attorney General was not a necessary party. In April 2009 this court allowed the Attorney General's motion for leave to intervene as an appellee.

[3]This section provides: "The separate existence of all corporations parties to the plan of merger or consolidation, except the surviving or new corporation, shall cease." 805 ILCS 5/11.50(a)(2) (West 2006). The measure applicable here is actually section

ECCH, as the surviving corporation, ECCH "ceased to exist." The court further found, with regard to the Davis trust, that ECCH "ceased to function as it did at the time of the testator's death when it dissolved on July 1, 2003 and when the building that had housed Edgar County children since 1900 closed." The court directed the Bank, as trustee of the Blackman and Davis trusts, to proceed in accordance with Ms. Blackman's and Ms. Davis' successor beneficiary provisions. The court's order included language pursuant to Rule 304(a) (210 Ill. 2d R. 304(a)) stating there was no just reason for delaying enforcement or appeal regarding counts I and II involving the Blackman and Davis trusts.

Kids Hope filed a timely postjudgment motion. Following a hearing, the circuit court denied the motion.

A divided appellate court reversed the granting of summary judgment with regard to both trusts, and remanded for further proceedings concerning the Davis trust. 386 Ill. App. 3d 1084. With regard to the Blackman trust, the appellate court rejected the circuit court's conclusion that ECCH ceased to exist, within the meaning of the will's language, solely as a result of its merger with Hudelson. On the contrary, the appellate court observed that a charity does not "cease to exist" for purposes of receiving a bequest unless the new corporation with which the original charitable organization merged is no longer suited to carry out the purposes of the bequest. 386 Ill. App. 3d at 1091. With regard to the Davis trust, the appellate court held that the agreed statement of facts did not support the circuit court's grant of summary judgment on either of the two grounds specified: that ECCH ceased to function in its present

111.50(b) of the General Not For Profit Corporation Act of 1986 (805 ILCS 105/111.50(b) (West 2006)). However, the language of the latter measure is identical to that of section 11.50(a)(2) of the Business Corporation Act.

capacity (1) when it entered into the merger in 2003, and (2) when the building on Eads Avenue subsequently closed. 386 Ill. App. 3d at 1093.

The dissent argued that the circuit court's judgment should be affirmed. The dissent agreed with the circuit court that, as a result of the merger, ECCH ceased to exist. According to the dissent, ECCH "no longer functioned as it did when Davis made her gift, and it no longer operated or existed as it did when Blackman made her gift." 386 Ill. App. 3d at 1096 (Knecht, J., dissenting).

## II. ANALYSIS

The granting of summary judgment is reviewed *de novo. Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 228 (2007). Summary judgment is proper where the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2006); *State Farm Mutual Automobile Insurance Co. v. Illinois Farmers Insurance Co.*, 226 Ill. 2d 395, 400 (2007).

Where, as here, the evidence before the circuit court is "documentary in nature," no deference is owed to the circuit court's findings. *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009).

With regard to the Blackman trust, the restrictive condition set forth in the will provides, in pertinent part, that if ECCH "should cease to operate or exist," the Bank, as trustee, is to distribute ECCH's portion of the trust income "to such charitable organization or organizations as it deems worthy of said money." The Bank argues that, as a result of the merger with Kids Hope, ECCH ceased to operate or exist within the meaning of this language, and the gift to ECCH therefore lapsed. According to the Bank, it was the testator's intent that if

ECCH ceased to exist as a separate corporate entity, the alternate distribution provisions should take effect.[4]

In interpreting trusts, which are construed according to the same principles as wills, the goal is to determine the settlor's intent, which the court will effectuate if it is not contrary to law or public policy. *First National Bank of Chicago v. Canton Council of Campfire Girls, Inc.*, 85 Ill. 2d 507, 513 (1981). In determining this intent, courts consider the plain and ordinary meaning of the words used, taking into consideration the entire document. *Campfire Girls*, 85 Ill. 2d at 514. "Charitable gifts are viewed with peculiar favor by the courts, and every presumption consistent with the language contained in the instruments of gift will be employed in order to sustain them." *Village of Hinsdale v. Chicago City Missionary Society*, 375 Ill. 220, 231 (1940); see also *Stubblefield v. Peoples Bank of Bloomington*, 406 Ill. 374, 384 (1950) ("The law looks with favor upon charitable trusts, and the courts apply liberal rules of construction to sustain them").[5]

---

[4]In its brief to this court, the Bank purports to distinguish *In re Estate of Fuller*, 10 Ill. App. 3d 460 (1973), a case cited by the appellate court. In *Fuller*, unlike the case at bar, there was no express forfeiture provision. For this reason, *Fuller* does not directly apply here, and we do not rely upon it in resolving this appeal.

[5]Where a settlor has expressed a general charitable intent but literal execution of the charitable provisions is impossible, impracticable, or inexpedient, courts will execute the trust *cy pres*, *i.e.*, as near as possible to the trust's original purpose, rather than allow it to fail. *Eychaner v. Gross*, 202 Ill. 2d 228, 278 (2002); *Village of Hinsdale*, 375 Ill. at 233; *Campfire Girls*, 85 Ill. 2d at 512-13. *Cy pres* does not apply, however, where the settlor has provided for an alternative charitable disposition in the event the original disposition cannot be fulfilled. *Campfire Girls*, 85 Ill. 2d at 513. In the case at bar, each of the wills at issue provides for such an alternative disposition.

In the case at bar, it is true that ECCH ceased to exist as a separate corporate entity following its merger with Kids Hope. Section 111.50(b) of the General Not For Profit Corporation Act provides: "The separate existence of all corporations parties to the plan of merger or consolidation, except the surviving or new corporation, shall cease." 805 ILCS 105/111.50(b) (West 2006). However, the important question here is not whether ECCH ceased to exist as a separate entity. Rather, in interpreting the restrictive condition to determine the testator's intent, the important question is, as the appellate court below correctly noted, whether "the new corporation with which the original charitable organization *** merged was no longer suited to carry out the purposes of the bequest." 386 Ill. App. 3d at 1091. If Kids Hope is not suited to carry out the purposes of Blackman's bequest, ECCH will have ceased to operate or exist within the meaning of Blackman's restrictive condition, and the gift to ECCH would lapse. If, however, Kids Hope *is* suited to carry out the purposes of the bequest, then in our view ECCH did not cease to operate or exist, as Blackman meant those words, even if it did cease to exist as a separate corporate entity. We note, in this regard, that there is nothing in the language of Blackman's restrictive condition which would indicate that she meant "cease to operate or exist" to refer to ECCH's separate corporate existence.

In the 2003 merger agreement between Hudelson and Kids Hope, Hudelson "guarantee[d] that ECCH's mission of working with children in Edgar and the surrounding counties will be continued for as long as it is financially feasible to do so." Moreover, part of the object for which ECCH was established was to "provide permanent homes for [the dependent children of Edgar County] in approved private families." According to the parties' agreed statement of facts, Kids Hope currently

"has families in Edgar County who serve as approved foster homes." We agree with the appellate court that "the merger did not hinder [Kids Hope's] ability to carry out the purposes of Blackman's original bequest." 386 Ill. App. 3d at 1092. Kids Hope is suited to carry out these purposes, and ECCH did not cease to operate or exist as Blackman intended those words.

We find support for this conclusion in *In re Will of Hagan*, 234 Iowa 1001, 14 N.W.2d 638 (1944), where the will at issue employed the same "cease to exist" language as in the case at bar. Under the will in *Hagan*, the income from a testamentary trust was to be divided equally between two colleges, Drake University and Penn College, for the purpose of providing annual scholarships, but if either ceased to exist, the income was to be given to the surviving institution. In 1933, facing financial difficulties as a result of the Great Depression, Penn College decided to form a new corporation, William Penn College, which would lease from Penn College its buildings and grounds and operate the college. In the lease, which was executed in June 1933, the lessee, William Penn College, agreed " 'to carry on the operation of the college according to its articles of incorporation.' " *Hagan*, 234 Iowa at 1005, 14 N.W.2d at 640. Under the new corporation, teaching was not interrupted, and the faculty, curriculum, physical plant, and other aspects of the original institution remained substantially the same. In 1934, a mortgage on the property of Penn College was foreclosed. Following a foreclosure sale, William Penn College obtained the deeds to the property and paid the mortgage. The court held that the phrase "cease to exist" as used in the restrictive condition meant "cease to exist as an educational institution." *Hagan*, 234 Iowa at 1007, 14 N.W.2d at 642. According to the court, Penn College did not cease to exist as an educational institution "merely because a distinct corporation has taken

over the legal title and business management of the college." *Hagan*, 234 Iowa at 1008, 14 N.W.2d at 642. The court stated: "If testatrix had intended a mere change in name of the college or in its ownership and operation to terminate its right to a share of the trust income, she could easily have so stated. This she did not do." *Hagan*, 234 Iowa at 1009, 14 N.W.2d at 642. See *Fidelity Union Trust Co. v. Ackerman*, 18 N.J. Super. 314, 319-20, 87 A.2d 47, 49-50 (Ch. Div. 1952) (describing as "finicky legalism" the notion that a charity which merges into or consolidates with another ceases to exist so as to cause a charitable gift to lapse).

Notwithstanding the foregoing, the Bank maintains that ECCH ceased to exist. In support, the Bank points to the closure and subsequent sale of the Eads Avenue facility by Kids Hope. The Bank states: "There is no [Edgar County] Children's Home or vestige thereof in Edgar County."

The restrictive condition in the Blackman will provided for the lapse of its charitable gifts if either named "organization[ ]" ceased to operate or exist. There was no express requirement that the Eads Avenue *facility* remain open. Moreover, in the event the gifts do fail, the alternate distribution provision directs the Bank to select charities which it "deems worthy" of the trust income. Significantly, this provision does not require the Bank to select charities having any presence in Edgar County, let alone a physical facility in Edgar County.

There is nothing in the relevant language in the Blackman will indicating that the gift to ECCH was specifically conditioned on the Eads Avenue facility's remaining open. ECCH did not cease to operate or exist, within the meaning of those terms, as a result of the closure and sale of the Eads Avenue facility.

With regard to the Davis trust, the restrictive condition differs from that in the Blackman will. After naming

the same two beneficiaries as did the Blackman will—ECCH and the Embarrass Cemetery—the Davis will stated: "In the event either of the aforesaid organizations shall cease to function in its present capacity, then the part of the trust fund which would have gone to this organization shall be divided equally" among three other named charities in Edgar County. The circuit court found that ECCH ceased to function in its present capacity when (1) it merged with Kids Hope in 2003, and (2) the facility on Eads Avenue closed.

The appellate court disagreed, concluding that the parties' agreed statement of facts did not support the grant of summary judgment on either of the grounds specified by the circuit court. In the appellate court's view, a genuine issue of material fact remained as to whether ECCH had ceased to function in its "present capacity."

The Davis will was executed in 1968 and took effect in 1971, so the relevant inquiry involves the nature of ECCH's operations at that time. However, the agreed statement of facts does not include any description of ECCH's actual operations at that point.

The statement does note that in 1980 ECCH amended its articles of incorporation to include the purpose of serving as a residential placement resource for children throughout Illinois, not just Edgar County, in order to receive state funding. In addition, the statement notes that in the 2003 merger agreement, Hudelson " 'guaranteed that ECCH's mission of working with children in Edgar and the surrounding counties will be continued.' " However, without a description of ECCH's actual operations at the time the will was executed and took effect, it is impossible to conclude, one way or the other, whether Kids Hope's current activities are materially the same as ECCH's activities at that point.

The agreed statement of facts is thus insufficient to support the circuit court's finding that ECCH ceased to function in its "present capacity" on either ground specified: (1) when it entered into the merger in 2003, and (2) when the building on Eads Avenue closed. In each case, the same necessary element is missing: a description of ECCH's actual operations when the will was executed and took effect.

With regard to the Eads Avenue facility, the appellate court stated:

"At what date did the building on Eads Avenue stop serving as a traditional orphanage? Surely, it was not as recent as *** when the building closed. The agreed statement of facts indicates that [ECCH] stopped functioning as a traditional orphanage long before the charitable corporations merged or the house on Eads Avenue closed, and perhaps the transition began during Davis's lifetime. Regardless, we cannot say as a matter of law that the closure of the Eads [Avenue] building would mean that [ECCH] ceased to function in its 'present capacity.' " 386 Ill. App. 3d at 1093.

We agree with the appellate court that the agreed statement of facts was insufficient to support summary judgment in favor of the Bank regarding the Davis trust.

The Bank argues, as it did concerning the Blackman trust, that because ECCH merged with Kids Hope, ECCH ceased to exist. The Bank states: "Therefore, there is no real question about whether it is functioning in its present capacity. It was not functioning at all."

We reject this argument for the reasons set forth in our analysis of the Blackman trust.

### III. CONCLUSION

We affirm the judgment of the appellate court reversing the circuit court's granting of summary judgment in favor of Citizens National Bank of Paris and remanding the cause to the circuit court of Edgar County for further proceedings regarding the Davis trust.

*Appellate court judgment affirmed.*

JUSTICE KARMEIER, dissenting:

It is often said that we live in a rootless society, but in rural Illinois counties and communities, "place" still matters. Forty years ago, when La Fern Blackman and Ettoile Davis signed their wills, small towns in rural Illinois were—and to a large extent still are—the gathering places for farmers from the surrounding environs, the economic and societal hubs for a predominantly agrarian way of life committed to, among other laudable values, helping neighbors in need. "Neighbors," perhaps then a broader term than current usage admits, meant people from surrounding farms as well as those in town, where everyone went to learn, worship, visit, buy and sell. La Fern and Ettoile, as rural landowners, were part of that culture, and, because they valued its institutions and the community of which they were a part, they sought to perpetuate them with testamentary gifts to local charitable organizations. That is what La Fern and Ettoile intended, and that is what their attorneys no doubt assumed they had effectuated—with alternate dispositional provisions designed to ensure local benefit—but with the filing of this opinion, and its close-enough analysis, those last wishes have been effectively and unnecessarily thwarted.

The majority acknowledges at the outset that our goal is to effectuate the settlors' intent, considering the plain meaning of the words they used, but the majority then undertakes a strained construction of those words and their implications in a puzzling effort to sustain Kids Hope's possession of, and entitlement to, assets and income in pursuit of a mission beyond anything the settlors would have imagined or intended. In the end, the majority focuses more upon whether Kids Hope has the *ability,* and is *suited,* to provide services to children in Edgar County, without giving any meaningful consideration to the *extent* it actually does so. It seems to me,

under this disposition, the sisters' gifts to the children of Edgar County have been diluted to near insignificance.

The majority's strained construction is both baffling and unnecessary because, if the aim here is merely to ascertain intent and sustain charitable gifts, as professed, under the alternate provisions of the settlors' wills, charities will still benefit. The obvious difference is, under the alternate disposition, local charities will *likely* benefit in one instance—where a local trustee is to name charitable organizations deemed worthy (La Fern)—and will *certainly* benefit in the other—where local charities were *specifically* named by the settlor (Ettoile). That is undoubtedly what the settlors intended.

During the entirety of the sisters' lives, ECCH, as embodied by the physical home on Eads Avenue, in Paris, Illinois, had a well-defined, self-avowed purpose: to provide "for the education of dependent children of *Edgar County*, Illinois, and for the custody and maintenance of *such children*." (Emphases added.) Had La Fern and Ettoile intended to benefit children across the state—or even throughout the nation—there were undoubtedly organizations that could have accomplished that purpose, and to which they could have left a suitable endowment. However, tellingly, that is not what they did.

La Fern's intent to benefit *local* organizations can be discerned in the initial charities she chose: the *Edgar County* Children's Home and the Embarrass Cemetery of *Edgar County*. At the time her will was executed, ECCH was embodied in a physical structure in Paris, Illinois, and its mission had not yet expanded beyond Edgar County. In the event those organizations "ceased to operate or exist," the trustee, a local bank, was to designate alternate organizations to receive the money.

Similarly, Ettoile's will benefitted the same two local organizations and she made clear her intent to benefit *only* local charities, in the event those two organizations

"cease[d] to function in their present capacity," by specifically naming three alternate, local charities: First Methodist Church of Paris Memorial Foundation, Inc., the Edgar County Chapter of the American Cancer Society, and the Edgar County Heart Association. At the time her will was executed, ECCH operated only out of the home on Eads Avenue and only served children in Edgar County.

In 2003, ECCH "ceased to exist" in a corporate and organizational sense by reason of its merger, as the majority acknowledges. Certainly, by 2006, when the building in Paris was sold, the last vestiges of ECCH, *as La Fern and Ettoile knew it*, were gone. The trustee recognized as much, and shortly thereafter petitioned the circuit court. Hence, ECCH, as La Fern knew it, "ceased to operate or exist" when the mission was expanded, the organizational entity disappeared, and the displacive entity sold the building in Paris. Consequently, the alternate beneficiary provision of La Fern's will should be given effect and the trustee should, pursuant to La Fern's direction, be allowed to distribute income to "such charitable organization or organizations as it deems worthy of said money."

With respect to the beneficiary provisions in Ettoile's will, it is clear that ECCH long ago ceased to function in the capacity it had during her life. Nine years after her death it expanded its mission statewide, well beyond what it was in her lifetime. Then it merged with Hudelson, having obtained the ominous promise that Hudelson would provide services to children in Edgar County "for as long as it is financially feasible to do so." Then, not surprisingly, the children's home that embodied the charity, as Ettoile knew it, was closed by Kids Hope and sold. In light of these facts of record, it simply cannot be said that ECCH functioned in the capacity it had during Ettoile's lifetime. Since it does not, the alternate local charities should take.

The majority opinion clearly frustrates the intent of *these* settlors, and I suspect, it will have more far-reaching consequences as well. Attorneys, at additional expense to clients, will be compelled to spend more time drafting provisions for charitable dispositions, striving to anticipate every possible contingency and to specify the meaning of existence. After all, "cease to operate or exist" and "cease to function in their present capacity" are no longer phrases subject to their common understanding. Now, when they do, they don't. They "exist" and "function," according to the majority, if we can still hear the faint echo of their demise. If a mere specter of the original charity survives, if it provides a mere pittance of the original benefit to those for whom it was intended, it lives on in some ethereal plane, and courts will be loathe to hold the gift lapsed, even where—as here—the settlors have specified alternate charities. An opinion such as this could actually have a chilling effect on testamentary giving to charities, because hereafter no one can be sure where the money will end up.

In my view, we are not at liberty to choose charities that *we* deem fit to receive the settlors' money (pursuant to La Fern's will, that is the *trustee's* prerogative); nor is the Attorney General, whose intervention on behalf of one charity over another belies the statewide diffusion of the local benefit originally intended. It is the intent of the settlors that we must honor, and that intent is best implemented by recourse to the alternate provisions of their wills. The majority pays lip service to ascertaining and honoring the settlors' intent, but ultimately ignores their clearly discernible wishes and substitutes its judgment for theirs. I cannot subscribe to that outcome. Accordingly, I would affirm the judgment of the circuit court of Edgar County.